# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

———————

**CAPITAL CASE**

No. 25-13545

———————

ANTHONY BOYD,
*Plaintiff-Appellant*,

*v.*

COMMISSIONER, ALABAMA DEPARTMENT OF CORRECTIONS,
HOLMAN CF WARDEN,
*Defendants-Appellees*.

———————————————————

On Appeal from the United States District Court
for the Middle District of Alabama
(D. C. Civil Action No. 2:25-cv-00529)
District Judge: Honorable Emily Coody Marks, Chief Judge

———————————————————

APPELLANT'S OPENING BRIEF
**CAPITAL CASE – EXECUTION SCHEDULED OCT. 23, 2025**

———————————————————

Matthew C. Moschella
John C. La Liberte
SHERIN AND LODGEN LLP
One Lincoln Street, 14th Floor
Boston, Massachusetts 02111
(617) 646-2000
mcmoschella@sherin.com
jclaliberte@sherin.com

*Attorneys for Appellant Anthony Boyd*



United States Commercial Printing Company • (202) 866-8558 • www.uscpc.us
Expert Legal Document Preparer & Printer for U.S. Supreme & Appellate Courts

# CERTIFICATE OF INTERESTED PERSONS

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, Plaintiff-Appellant Anthony Boyd hereby submits a complete list of all judges, attorneys, persons, associations of persons, partnerships, or corporations that have an interest in the outcome of this appeal:

1. Antognini, Joseph F. (MD) – Appellees/Defendants' Expert Witness;

2. Bickler, Philip E. (MD) – Appellant/Plaintiff's Expert Witness;

3. Boyd, Anthony – Appellant/Plaintiff;

4. Cho-Carr, Noel Y. – Counsel to Appellant/Plaintiff;

5. Guenther, Daniel S. – Counsel to Appellant/Plaintiff;

6. Hamm, John Q. – Appellee/Defendant, Commissioner of the Alabama Department of Corrections;

7. Huguley, Gregory (Estate of) – Victim;

8. Kenny, Polly S. – Counsel to Appellees/Defendants;

9. La Liberte, John C. – Counsel to Appellant/Plaintiff;

10. Marks, Hon. Emily Coody – United States District Judge, Middle District of Alabama;

11. Mauldin, Dylan L. – Counsel to Appellees/Defendants;

12. McAlary, Brian G. (MD) – Plaintiff/Appellant's Expert Witness;

13. Michel, David A. – Counsel to Appellant/Plaintiff;

14. Moschella, Matthew C.– Counsel to Appellant/ Plaintiff;

15. Overing, Robert M. – Counsel to Appellees/Defendants;

16. Raybon, Terry – Appellee/Defendant, Warden of the Holman Correctional Facility;

17. Schwartz, Eyal – Counsel to Appellant/Plaintiff;

18. Sherin and Lodgen LLP – Law firm representing Appellant/Plaintiff;

19. Simpson, Lauren – Counsel to Appellees/Defendants;

20. Williams, James S. (MD) – Appellant/Plaintiff's Expert Witness; and

21. Zapata, Carly (MD) – Appellant/Plaintiff's Expert Witness.

No publicly traded company or corporation has an interest in the outcome of this appeal.

Respectfully submitted,

Dated: October 13, 2025

/s/ Matthew C. Moschella
Matthew C. Moschella
John C. La Liberte
SHERIN AND LODGEN LLP
One Lincoln Street, 14th Floor
Boston, Massachusetts 02111
(617) 646-2000
mcmoschella@sherin.com
jclaliberte@sherin.com

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Fed. R. A. P. 34(a) and 11th Cir. R. 28-1(c), Appellant Anthony Boyd respectfully submits that this Court should schedule oral argument on this appeal. This case presents important constitutional questions regarding the State of Alabama's nitrogen hypoxia method of execution. The record below – including a two-day preliminary injunction hearing, the numerous exhibits, and post-hearing briefing – is voluminous. Boyd believes that oral argument will assist the Court in reviewing and interpreting that record and in assessing whether the district court erred when it denied Boyd's Motion for Preliminary Injunction.

Boyd's execution is scheduled for Thursday, October 23, 2025. Accordingly, he requests oral argument before that date. Boyd also has moved this Court to enjoin and stay his execution pending the resolution of his appeal.

# TABLE OF CONTENTS

Page

Certificate of Interested Persons ................................................. i

Statement Regarding Oral Argument ....................................... iv

Table of Contents ....................................................................... v

Table of Authorities .................................................................. vii

Jurisdictional Statement ............................................................ 1

Statement of the Issues.............................................................. 2

Statement of the Case ................................................................ 4

A. The Alabama Legislature Authorized Nitrogen Hypoxia as a Method of Execution in 2018. ................................................. 5

B. Boyd Files His § 1983 Complaint Seeking Alternative Means of Execution. ............................................................................. 6

C. One Month After He Filed His Motion for Preliminary Injunction, the State Sets Boyd's Execution Date. ................ 7

D. The District Court Denies Boyd's Motion for Preliminary Injunction. ................................................................................ 7

E. The Five Executions Prior to the Preliminary Injunction Hearing Resulted in Conscious Suffocation. .......................... 7

    1. The Smith Execution ..................................................... 8

    2. The Miller Execution ..................................................... 9

    3. The Grayson Execution................................................. 11

    4. The Frazier Execution .................................................. 12

    5. The Hunt Execution...................................................... 13

F. There are Two Readily Available and Implemented Alternatives to Nitrogen Hypoxia......................................... 13

Summary of the Arguments ................................................................ 14

Standard of Review ........................................................................... 17

Argument ........................................................................................... 18

    I.    The District Court Erred By Finding that the State's
        Protocol Does Not Cause Much, or Any, Physical Pain. ...... 18

        A.    The Only Expert in Human Hypoxia to Testify Stated
                that Each Person Executed Pursuant to the State's
                Protocol Has Experienced Conscious Pain and
                Suffering. ..................................................................... 20

        B.    The Arguments Made by Appellees' Expert Are
                Unsupported and Should Be Rejected. ......................... 29

        C.    The District Court Ignored Evidence of Superadded Pain.
                .................................................................................. 34

    II.    The District Court Erred By Finding That A Firing Squad
        Would Not Significantly Reduce A Substantial Risk Of
        Severe Pain When Compared To The State's Nitrogen
        Hypoxia Protocol. ................................................................ 38

    III.    The District Court Erred In Finding That Medical Aid In
        Dying Was Not A Feasible And Readily Implemented
        Alternative To The Protocol. ............................................... 53

    IV.    The District Court Erred By Concluding that the Equities
        Did Not Favor Boyd. ........................................................... 57

Conclusion ........................................................................................ 64

Certificate of Compliance ................................................................ 66

Certificate of Service ....................................................................... 67

# TABLE OF AUTHORITIES

**Cases**

*Adams v. Lab. Corp. of Am.,*
    760 F.3d 1322 (11th Cir. 2014)...........................................18

*Baze* v. *Rees,*
    555 U.S. 35 (2008)...............................................18, 35, 63

*Boyd* v. *Alabama,*
    525 U.S. 968 (1998)..................................................5

*Boyd v. State,*
    715 So. 2d 825 (Ala. Crim. App.1997) ...................................5

*Boyd v. State,*
    715 So. 2d 825 (Ala. Crim. App.1997), *aff'd,* 715 So. 2d 852 (Ala.
    1998), *cert. denied,* 525 U.S. 968 (1998) ...............................5

*Brooks* v. *Warden,*
    810 F.3d 812 (11th Cir. 2016)..........................................18

*Bucklew* v. *Precythe,*
    587 U.S. 119 (2019).....................................2, 18, 34, 35, 36

*Glossip* v. *Gross,*
    135 S. Ct. 2726 (2015).....................................17, 61, 62, 63

*Grayson* v. *Comm'r, Ala. Dep't of Corr.,*
    121 F.4th 894 (11th Cir. 2024) .........................................19

*Hamm* v. *Comm'r, Ala. Dept. of Corr.,*
    2018 WL 2171185 (11th Cir. Feb. 13, 2018).............................17

*Hoffman* v. *Westcott,*
    2025 WL 763945 (M.D. La. Mar. 11, 2025) .........................32, 34

*Kyles* v. *Whitley,*
514 U.S. 419 (1995)................................................................59

*Louisiana ex rel. Francis* v. *Resweber,*
329 U.S. 459 (1947)................................................................35

*Murphy* v. *Collier,*
587 U.S. 901 (2019)................................................................62

*Nken* v. *Holder,*
556 U.S. 418 (2009)................................................................58

*Ramirez* v. *Collier,*
595 U.S. 411 (2022).....................................................4, 58, 62

*Schiavo ex rel. Schindler* v. *Schiavo,*
403 F.3d 1223 (11th Cir. 2005)......................................18, 58

*Smith* v. *Hamm,*
2024 WL 116303 (M.D. Ala., Jan. 10, 2024)........................58

*United States* v. *Rahimi,*
602 U.S. 680 (2024)................................................................37

*Wilkerson* v. *State of Utah,*
99 U.S. 130 (1878)..................................................................38

*Woodson* v. *North Carolina,*
428 U.S. 280 (1976)................................................................59

**Statutes**

28 U.S.C. § 1292 .........................................................................1

28 U.S.C. § 1331 .........................................................................1

28 U.S.C. § 1343 .........................................................................1

28 U.S.C. § 1391 .........................................................................1

28 U.S.C. § 1983 ....................................................................... 6

42 U.S.C. § 1983 ....................................................................... 1

Ala. Code § 15-18-82.1 ............................................................. 5

Idaho Code § 19-2716 ............................................................ 38

Miss. Code § 99-19-51 ............................................................ 38

Okla. Stat. tit. 22, § 1014 ..................................................... 38

S.C. Code § 24-3-530 .............................................................. 38

Utah Code § 77-18-113 ........................................................... 38

**Other Authorities**

42 Am. Jur. 2d Injunctions § 15 ........................................... 59

J.B. Hudnall, A. Suruda, and D.L. Cambell, *Death involving air-line respirators connected to inert gas sources* (OSHA, Jan. 1993) .............................................................. 32

OSHA Report, *Accident Investigation Summary* (Feb. 20, 2020) ..................................................................... 33

OSHA Report, *Deaths Involving the Inadvertent Connection of Air-line Respirators to Inert Gas Supplies* (2010) ........................................................................................ 33

Russel D. Ogden, William K. Hamilton, and Charles Whitcher, *Assisted suicide by oxygen deprivation with helium at a Swiss right-to-die organisation* (2010) ................................................... 30, 31

U.C. Luft, H.G. Clamann, and E. Opitz, *The Latency of Hypoxia Exposure to Altitude Above 50,000 Feet*, Aviation Medicine (April 1951) ......................................................................... 33

W. Ottestad, et al., *Acute hypoxia in a simulated high-altitude airdrop scenario due to oxygen*, (2017)..................................................................................................33

# JURISDICTIONAL STATEMENT

Boyd's civil rights lawsuit, brought under 42 U.S.C. § 1983, alleges *inter alia* that his execution pursuant to Alabama's nitrogen hypoxia protocol, scheduled to occur on October 23, 2025, will violate the Eighth Amendment of the United States Constitution. The district court has subject-matter jurisdiction over Boyd's lawsuit pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a), and venue pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2).

On July 18, 2025, Boyd filed a Motion for Preliminary Injunction (App.58-236)[1], requesting that the district court enjoin his execution (which had not yet been scheduled at the time of filing, but was later scheduled) from proceeding under Alabama's nitrogen hypoxia protocol.

On October 9, 2025, the district court issued a Memorandum Opinion and Order denying Boyd's Motion for Preliminary Injunction. Boyd filed his notice of appeal later that same day.

This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

---

[1] Non-sealed volumes of the appendix are cited as "App.[page number]", sealed volumes are cited as "App.S-[page number]". Only volumes within the same category are continuously paginated.

# STATEMENT OF THE ISSUES

1.    The Constitution demands that a method of execution not cause needless suffering or superadd pain beyond what is needed to effectuate a death sentence. *Bucklew* v. *Precythe*, 587 U.S. 119, 137 (2019). Alabama's nitrogen hypoxia execution protocol causes a human to consciously experience symptoms of asphyxiation (air hunger, shortness of breath, aching lungs, elevated heart rate, blood pounding in the ears, the feeling of conscious suffocation or of being trapped deep underwater) which leads to a "fight or flight" sympathetic nervous response and attendant physical distress and emotional terror for at least between two to seven minutes. Did the Appellant establish a likelihood of success in establishing a Constitutional violation entitling him to a preliminary injunction and stay of execution so as to allow for a full adjudication on the merits?

2.    In determining whether an inmate has established an Eighth Amendment violation courts require the inmate to present an available and readily implemented alternative. The Appellant proposed death by a firing squad (which the district court found to be a feasible and readily implemented alternative) but then erroneously concluded that the near

instantaneous death by firing squad did not sufficiently reduce the substantial risk of severe pain compared to nitrogen hypoxia. Did the district court err either in finding that near instantaneous – and pain free – death by firing squad would not significantly reduce the substantial risk of severe pain compared to the two to seven minutes of conscious suffocation under nitrogen hypoxia?

3.    The Appellant also proposed death by medical aid in dying ("MAID"), which allows for death under near total sedation, but the district court rejected this proposed alternative as not available or readily implemented because of MAID's length of time to effectuate death, a lack of medical professionals to administer it, and a lack of other states implementing MAID as an execution protocol. Did the district court err in rejecting MAID as an alternative where the length of time of an execution is not a legally recognized consideration and, in any event, outweighed by the reduction of the risk of superadded pain, all current methods of execution lack medical professionals to administer it, and the lack of other state's usage is legally irrelevant?

4.    Traditional considerations of equity apply in method of execution cases and courts may evaluate, as part of the totality of the

circumstances, whether a litigant unnecessarily delayed in bringing their claim. *Ramirez* v. *Collier*, 595 U.S. 411, 434 (2022). Appellant brought a challenge to his method of execution before his execution date was set, moved expeditiously for a preliminary injunction, and demonstrated that the information gathered by the observation of the five executions (only available because of his waiting) is unquestionably probative of the unsettled Constitutional questions presented and analyzed by the district court. Did the district court err by finding that the timing of Appellant's claim was fatal to his request for injunctive relief?

## STATEMENT OF THE CASE

Boyd is an inmate on death row at the William C. Holman Correctional Facility ("Holman") in Atmore, Alabama. On March 16, 1995, a jury convicted Boyd of capital murder in the Talladega County Circuit Court (the "Circuit Court"). That same day, the jury returned a 10-2 recommendation that he be sentenced to death. On May 19, 1995, the Honorable Jerry Fielding, Talladega County Circuit Judge, made findings of fact with respect to certain aggravating factors, weighed the mitigating factors, and sentenced Boyd to death. Boyd's death sentence was affirmed on direct appeal. *Boyd* v. *State*, 715 So. 2d 825 (Ala. Crim.

App.1997), *aff'd*, 715 So. 2d 852 (Ala. 1998). The United States Supreme Court denied certiorari. *Boyd* v. *Alabama*, 525 U.S. 968 (1998).

The question that this appeal presents is whether the State of Alabama should be allowed to execute Boyd on October 23, 2025 by means of nitrogen asphyxiation pursuant to Alabama's nitrogen hypoxia protocol (the "Protocol"), despite overwhelming evidence that inmates previously executed by the Protocol were subject to cruel and unusual punishment – specifically, conscious suffocation – in violation of the Eighth Amendment and that Boyd will also suffer cruel and unusual punishment under the Protocol.

## A.    The Alabama Legislature Authorized Nitrogen Hypoxia as a Method of Execution in 2018.

In 2018, the Alabama Legislature authorized execution by an untested method: nitrogen hypoxia. *See* Ala. Code § 15-18-82.1(b)(2). Shortly thereafter, and beginning June 1, 2018, death-sentenced prisoners were given 30 days to opt into the nitrogen hypoxia protocol or remain subject to execution by lethal injection. Boyd opted into the as-yet undeveloped nitrogen hypoxia method, while reserving his right to challenge the constitutionality of any nitrogen hypoxia method that Appellees ultimately devised.

In August 2023, Appellees released a heavily redacted version of the Protocol. As discussed below, the Protocol has been used in six executions since then. Those executions – and what has become known about the conscious pain and suffering that they entail – led Boyd to challenge the Protocol and seek an alternative method of execution.

## B. Boyd Files His § 1983 Complaint Seeking Alternative Means of Execution.

On June 11, 2025, the Attorney General moved the Alabama Supreme Court to authorize the Governor to set an execution time frame for Boyd to be executed, by means of the Protocol.

On July 16, 2025 – and before his execution date had been set – Boyd filed suit under 28 U.S.C. § 1983, alleging that Alabama's Protocol violates the Eighth Amendment's prohibition against cruel and unusual punishment.

Two days later, on July 18, 2025, Boyd's filed a Motion for Preliminary Injunction. App.58-236. The district court set a hearing on that Motion for September 4, 2025.

**C.** **One Month After He Filed His Motion for Preliminary Injunction, the State Sets Boyd's Execution Date**.

On August 18, 2025, the State set Boyd's execution date for October 23, 2025.

**D.** **The District Court Denies Boyd's Motion for Preliminary Injunction.**

The district court held an evidentiary hearing on September 4 and 5, 2025. The parties thereafter filed post-hearing briefs. App.S-559-592; App.S-1550-15563; App.2700-2755; 2756-2770.

On October 9, 2025, the district court issued its Memorandum Opinion and Order (the "Order") denying Boyd's Motion for Preliminary Injunction. App.2771-2834. In its Order, the district court found that Boyd had not shown a likelihood of success on the merits and that the equities did not favor injunctive relief. App.2834.

**E.** **The Five Executions Prior to the Preliminary Injunction Hearing Resulted in Conscious Suffocation.[2]**

For purposes of its analysis, the district court "assume[d] without deciding … that an inmate subject to an execution under the Protocol who

---

[2] A sixth execution, of Geoffrey Todd West, occurred on September 25, 2025, which was after the evidentiary hearing and after the evidence was closed. *See* App.2782 n.12.

breathes more normally will become unconscious within approximately two minutes after nitrogen begins to flow." App.2811. The district court's assumption was amply supported by the record, which showed that inmates executed by the protocol remained conscious – and in physical pain – for *at least* two minutes, and likely several more, including up to seven minutes.

### 1. The Smith Execution

Appellees executed Kenneth Eugene Smith on January 25, 2024. App.692:11-13. After nitrogen began to flow, Smith began "making violent movements." App.684:2. "His feet went up from the gurney and down very rapidly." App.684:2-3). "His head also left the gurney back and forth several times." App.684:3-4. His arms and hands were "straining against the gurney." App.684:4-6. Those movements lasted for "minutes." App.684:9-11. After the movements stopped, there was a period of time when Smith was gasping for air and gasping for breath. App.684:12-14. In total those movements lasted approximately "two to three minutes." App.684:2-4. Smith's wife testified that it was "like watching someone drown without water." App.684:20-22.

One statutory media witness observed that Smith "convulsed for two minutes with seven minutes of heavy breathing as he took large breaths." App.693:13-20; App.1391-1397. Another statutory media witness observed that Smith "appeared to convulse and shake vigorously for about four minutes after the nitrogen gas apparently began flowing through his full-face mask in Alabama's death chamber. It was another two to three minutes before he appeared to lose consciousness, all while gasping for air to the extent that the gurney shook several times." App.704:5-13; App.1385-1390; *see also* App.705:7-15; App.1275-1279; App.1289; App.1337-1349; App.1362-1372; App.1385-1390; App.1412-1413; App.1426-1434.

Captain McKenzie conceded that it "seemed like several minutes or so" that Smith remained conscious following the flow of nitrogen and that "[t]o me it seemed like a while, yes." App.1043:3-8; App.1920:18-21.

### 2.    The Miller Execution

Appellees executed Alan Eugene Miller on September 26, 2024. App.705:18-20. During his execution, at 6:15 p.m., Miller was "breathing normally, and all of sudden he started to convulse." App.721:18-19. "It was sort of lightly at first, and then it became more strong, almost like

violent convulsions." App.721:19-21. The convulsion started at 6:15 p.m. and lasted until 6:20 p.m. App.722:18-20. His eyes were opened that whole time. App.722:18. During that time, Miller was also gasping for breath severely almost like he had been "under water in pool for a very long time" and had just come up. App.722:20-24.

Another statutory media witness observed that "Miller gasped, shook, and struggled against his restraints for two minutes after the gas apparently began to flow. He continued to gasp and move for several more minutes after apparently losing consciousness[.]" App.706:24-707:15; App.1380-1384. That same witness observed that at 6:18 "[t]he gas apparently began to flow. Miller took several large gasps and began writhing and flinching. His left hand shook and clenched into a fist several times. He lifted his head from the gurney several times. The gurney shook on two occasions." App.1380-1384; App.707:16-22; *see also* App.1280-1283; App.1324-1336; App.1412-1413; App.1426-1427, 1436-1445.

Captain McKenzie, who was stationed next to Miller in the execution chamber, confirmed that the time frame from when nitrogen

was introduced to the time Miller raised his legs "may have been a few minutes." App.1045:20-1046:11.

### 3. The Grayson Execution

The State executed Carey Dale Grayson on November 21, 2024. App.708:14-16. As one statutory media witness observed:

> Like two others previously executed by nitrogen, Grayson shook at times before taking a periodic series of gasping breaths. …
>
> It was unclear when the gas began flowing. Grayson rocked his head, shook and pulled against the gurney restraints. He clenched his fist and appeared to struggle to try to gesture again. His sheet-wrapped legs lifted off the gurney into the air at 6:14 p.m. He took a periodic series of more than a dozen gasping breaths for several minutes. He appeared to stop breathing at 6:21 p.m., and then the curtains to the viewing room were closed at 6:27 p.m.

App.1284-1288; App.1412-1413; *see also* App.710:10-16; App.774:13-775:13; App.1350-1361; App.1373-1379; App.1407-1408; App.1414-1425.

Dr. Brian McAlary, a board-certified anesthesiologist with 55 years of experience, testified at the hearing (on behalf of Boyd) that, in his expert opinion, Grayson was conscious for at least four minutes after nitrogen began to flow. App.787:19-23; *see also* App.782:17-784:6. The

Court assumed, without deciding, that Dr. McAlary's opinion was correct, and Grayson was conscious for four minutes. App.2812-2813.

Dr. McAlary observed that Grayson raised his legs in a measured and consistent manner. App.784:25-785:16. In Dr. McAlary's opinion, Grayson was conscious when he made that movement. App.786:1-3. *See also* App.1263-1274.

Captain McKenzie conceded that it took "probably a few minutes" for Grayson to appear unconscious. App.1048:13-1051:5.

### 4. The Frazier Execution

Appellees executed Demetrius Terrance Frazier on February 2, 2024. App.703:9-11. As one media witness confirmed, at 6:10 p.m., Frazier "appeared to move his fist in a slow, inward pumping motion, then appeared to open his fists with palms outstretched, followed by moving his hands in what seemed to be circular motions, as if imitating airflow. About thirty seconds later, his hands continued this apparent motion, but appeared to move more rigidly, occasionally off sync." App.1398-1404. The media witness continued that "Frazier clenched his face, and his nostrils flared, while his hands quivered" and that "[h]is legs slightly lifted up off the gurney and he gasped." App.731-733; App.1398-1404; *see also*

App.748:10-751:9; App.1290-1294; App.1306-1323; App.1405-1406; App.1412-1413; App.1426-1427, 1449-1468.

Captain McKenzie confirmed that he observed Frazier's arms tensing up against the gurney restraints and that he may have raised his legs, all before becoming unconscious. App.1051:13-25. Captain McKenzie also confirmed that it took "a few minutes after nitrogen was introduced" for Frazier to become unconscious. App.1052:1-5.

### 5. The Hunt Execution

Appellees executed Greg Hunt on June 10, 2025. App.871:11-13. As one of the statutory media witnesses observed "[t]he gas began flowing sometime after 5:55 p.m., but it was not clear exactly when." App.1295-1301; App.1412-1413. The witness further noted that "Hunt briefly shook, gasped and raised his head off the gurney" and later "raised his feet." *Id.* The witnesses concluded that "[t]he shaking movement and gasps were similar to previous nitrogen executions in Alabama." *Id.*

### F. There are Two Readily Available and Implemented Alternatives to Nitrogen Hypoxia.

Boyd has proposed two alternative methods of execution: execution by firing squad and MAID. App.916:24-917:6; App.934:24-935:3; App.929:18-23; App.934:24-935:3.

## SUMMARY OF THE ARGUMENTS

The district court assumed that inmates executed by the State's Protocol remain conscious for *at least* two minutes. The unrebutted evidence established that the inmates were likely conscious for several additional minutes, thereby experiencing conscious suffocation. The district court's finding was supported by the testimony of Boyd's expert, Dr. Philip Bickler, who was the only expert in human hypoxia to testify at the preliminary injunction hearing. Dr. Bickler testified that the Protocol causes intolerable pain and suffering, comparing the experience to an asthma attack. Dr. Bickler's testimony was unrebutted; instead, Appellees' expert focused primarily on how long it took for an inmate to lose consciousness (arguments which the district court did not adopt).

By its very nature, the Protocol causes needless suffering and superadded pain beyond what is needed to effectuate a death sentence. This superadded pain has occurred in each prior instance where the Protocol was employed because the Protocol ensures that the inmate will remain conscious as the physical symptoms of asphyxiation (air hunger, shortness of breath, aching lungs elevated heart rate, blood pounding in the ears, the feeling of suffocation, of an asthma attack, of being trapped

too deep underwater) feed a "fight or flight" sympathetic nervous response and attendant emotional terror. The district court erred in minimizing this physical pain as "discomfort" when it is anything but.

The district court also erred in its comparison of the Protocol with the alternatives that Boyd proposed. With respect to execution by firing squad, which is approved by five states and the United States military, the district court correctly concluded that the use of a firing squad is a feasible and readily implemented alternative. Yet the district court erred in determining that the use of a firing squad instead of the Protocol would not significantly reduce a substantial risk of severe pain. The district court reached its conclusion by erroneously including in its comparison the fear and anxiety an inmate experiences before an execution (regardless of the method) actually commences. According to the district court, because an inmate would experience "angst, anxiety, stress, or panic" whatever the method of execution, the Protocol did not substantially superadd pain as compared to a firing squad. This conclusion is clearly erroneous and flatly contradicted by the unrebutted testimony of Dr. James Williams, who stated that execution by firing squad cuts off blood flow and oxygen supply to the brain immediately and

completely. An inmate is unconscious in 3 to 5 seconds, and even in those few seconds before loss of consciousness, the inmate feels numbness. In contrast, as acknowledged by the district court, the Protocol involves two, four, or even seven minutes of conscious suffocation.

The district court also erred in rejecting MAID as a feasible and readily implemented alternative. The reasons cited by the district court did not justify its conclusion and were clearly erroneous. The undisputed evidence established that the State currently has non-medical staff perform functions that would be required under MAID and that the drugs used in MAID are widely available (and the exact mix is flexible in any event). The district court's concerns about how long a MAID execution could take obfuscated the unrebutted evidence that MAID would significantly reduce a substantial risk of severe pain caused by the Protocol. Finally, the district court's concern that MAID was not a method of execution authorized in any other jurisdiction is beside the point (as the district court acknowledged elsewhere in the Order.

Finally, the district court erred in finding that the equities did not favor Boyd because he engaged in dilatory litigation tactics. The district court erroneously treated the equitable analysis as an all or nothing

determination rather than a consideration of all relevant factors. Boyd brought suit before a date had even been set for his execution. The district court's suggestion that Boyd should have filed suit earlier is unrealistic on a practical level and overlooks that doing so would have prevented Boyd from proffering observational evidence about prior executions, evidence which demonstrates that executions under the Protocol constitute cruel and unusual punishment.

## STANDARD OF REVIEW

Where a death row inmate has brought a constitutional challenge to the State's chosen method of execution, the inmate's entitlement to a preliminary injunction staying his execution turns on whether he can establish a likelihood of success on the merits of his constitutional claims. *See, e.g.*, *Glossip* v. *Gross*, 135 S. Ct. 2726, 2737 (2015). Though an inmate seeking a stay of execution must demonstrate more than an "evidentiary toss-up," he need not "prove his case once and for all." *Hamm* v. *Comm'r, Ala. Dept. of Corr.*, 2018 WL 2171185, at *4 (11th Cir. Feb. 13, 2018). Instead, the inmate is entitled to a stay of execution if the "district court [ ] make[s] some findings that tilt the scales in the inmate's favor." *Id.*

The district court's Order denying Boyd's request for a stay of execution is reviewed for an abuse of discretion. *See, e.g.*, *Brooks* v. *Warden*, 810 F.3d 812, 818 (11th Cir. 2016). "[A]n error of law," however, "is necessarily an abuse of discretion." *Adams v. Lab. Corp. of Am.*, 760 F.3d 1322, 1331 (11th Cir. 2014). Abuse of discretion likewise occurs if, in denying a preliminary injunction, the court "relies on clearly erroneous factfinding, or if it reaches a conclusion that is clearly unreasonable or incorrect." *Schiavo ex rel. Schindler* v. *Schiavo*, 403 F.3d 1223, 1226 (11th Cir. 2005).

## ARGUMENT

### I. The District Court Erred By Finding that the State's Protocol Does Not Cause Much, or Any, Physical Pain.

A death-sentenced prisoner challenging a method of execution must show the method creates a "demonstrated risk of severe pain" that is "substantial when compared to the known and available alternatives." *Baze* v. *Rees*, 555 U.S. 35, 61 (2008). "The Eighth Amendment does not come into play unless the risk of pain associated with the State's method is 'substantial when compared to a known and available alternative.'" *Bucklew* v. *Precythe*, 587 U.S. 119, 134 (2019) (citations omitted). "[A] substantial risk of conscious suffocation can create an Eighth Amendment

problem regardless of the method of execution being used." *Grayson* v. *Comm'r, Ala. Dep't of Corr.*, 121 F.4th 894, 898 (11th Cir. 2024).

The district court assumed that an inmate would remain conscious for at least two minutes under the Protocol, App.2811-2812, yet ultimately concluded that this conscious suffocation of at least two minutes did not superadd pain and suffering far beyond the pain and psychological distress inherent in either execution by firing squad or MAID. Notably, the district court concluded that 'the firing squad carries with it a risk of three to five (possibly six) seconds of physical pain and suffering, and that type of *physical pain is absent in an execution under the Protocol*...." App.2821 (emphasis added); *see also* App.2814 (concluding that under the Protocol, an inmate's "*discomfort* is limited in duration to approximately two minutes if the inmate breathes more normally" (emphasis added)).

The district court's conclusion was legal error; the evidence showed overwhelmingly that the Protocol causes physical suffering violative of the Eighth Amendment.

**A. The Only Expert in Human Hypoxia to Testify Stated that Each Person Executed Pursuant to the State's Protocol Has Experienced Conscious Pain and Suffering.**

Dr. Philip Bickler, an expert in hypoxia, anesthesiology, and medicine, testified on behalf of Boyd. App.1147:25-1148:5. Dr. Bickler was the sole expert in human hypoxia to testify at the preliminary injunction hearing, and the only witness to have personal experience undergoing profound hypoxia. A physician and scientist, Dr. Bickler has spent over 40 years studying "the effects of hypoxia on humans," in addition to his work as a full professor and clinical anesthesiologist at University of California, San Francisco ("UCSF"). App.831:7-11. Dr. Bickler directs UCSF's Hypoxia Research Laboratory, the "preeminent laboratory that studies hypoxia in humans" and the "world's go-to place for studies related to hypoxia." App.831:11-12; App.832:1-2. Dr. Bickler's opinions are informed by his 40 years of experience researching hypoxia in the laboratory, including his observation of "many thousands" of the eight to ten thousand hypoxic volunteers studied by his laboratory, his work as a clinical anesthesiologist, and his personal experience undergoing profound hypoxia as a study volunteer when he first began

studying hypoxia as a young scientist. App.832:19-833:7; App.836:23-25; App.838:4-8.

Dr. Bickler testified that hypoxia is measured in terms of the amount of oxygen bound to hemoglobin in the blood, "the percentage of the hemoglobin that has oxygen bound to it is called the saturation." App.833:8-20. Normal saturation is in the 97-99% range. App.833:23-24. The Hypoxia Laboratory pioneered and, over decades of research, developed the processes and protocols currently used to safely induce hypoxia in humans. This research is of critical importance to the development, performance testing, and accuracy of pulse oximeters which are a ubiquitous and critically important medical device used to detect blood oxygen levels when used and placed properly. App.832:3-833:7.

Under current protocols, volunteer test subjects are gradually taken from a normal saturation level to the low 90% range, then to the 80% range, and finally to "around 70 percent saturation but no deeper." App.834:1-15. This is because "70 percent is the level at which the symptoms of oxygen deprivation begin to be very profound and are problematic, therefore our studies are designed in a way that avoids more

deep levels of hypoxia, greater degrees of oxygen deprivation."
App.834:16-19. During Dr. Bickler's early career in the 1980's,
experimentation "on producing even more profound levels of oxygen
deprivation, greater reductions in saturation, more deeper levels of
hypoxia" caused researchers to realize that "even young, healthy subjects
with normal lungs do not tolerate lower levels of oxygenation. They find
it extremely distressing." App.835:3-18.

Dr. Bickler considers his opinions concerning the use of nitrogen
hypoxia as a means of execution as "medical and scientific fact … not
personal opinions." App.837:4-7. According to him, "[n]itrogen hypoxia
induces unconsciousness and death by depriving the brain of oxygen, and
after a variable and unpredictable period, causes death by cardiac
arrest." App.1205. Dr. Bickler concluded to a degree of medical certainty
that "unnecessary and severe pain and suffering is *nearly certain* to arise
during an execution under the Protocol." App.1204 (emphasis added).
Informed by his expertise and the available medical evidence, he
concludes that execution under the Protocol "will cause intolerable pain

and suffering. The physiological and psychological effects of hypoxia will result in a profoundly distressing and inhumane experience." App.1208.[3]

Dr. Bickler's conclusions in his written reports and explained further through his testimony were made to a reasonable degree of medical and scientific certainty. App.1200-1209; App.1214; App.1647-1796; App.838:21-839:11. Dr. Bickler's reviewed eye witness accounts of every nitrogen hypoxia execution conducted prior to the hearing confirmed that superadded pain and terror have "played out in virtually every one of these executions…. our worst fears have been realized." App.838:14-20. "All the [eyewitness] accounts to date describe a prolonged death process with struggling, evident distress, irregular breathing and continued movements many minutes into the execution … purposeful movements that have occurred many minutes after the apparent initiation of nitrogen…. These include opening and closing of hands, rotating the hands, violently jerking the head from side to side … lifting of legs off the gurney among other movements. Such movements

---

[3] Indeed, even the State's expert (Dr. Antognini) agreed that severe emotional suffering "would be possible" and that severe emotional suffering would endure until a person becomes unconscious. App.1136:11-19.

are more probably than not indicative of conscious experience of suffering." App.1210-1211. It was clearly erroneous for the district court to conclude that these observed movements did not show each inmate suffering substantial physical pain prior to losing consciousness.

Dr. Bickler explained how the body's "very strong inborn response to lack of oxygen" drives a complex and interrelated physiological response that "involves a number of different parts of the body." App.839:12-19. Initially, low levels of oxygen in the blood are detected by the "carotid bodies … located in the carotid artery." App.839:23-25. These "chemosensors" or "chemoreceptors" send signals to the brain in response to decreased oxygen levels that drive a number of physiological responses." App.840:2-19. One physical response is a drive to "breathe more" – a sensation similar to the shortness of breath sensation associated with "high altitude or when we exercise or when oxygen becomes reduced, for example, in drowning." App.839:20-840:8. Because the carotid bodies are connected to parts of the brain stem that mediate the "flight or fight response", hypoxia induces a "primal response that is deeply threatening on an emotional level, compounded by the physical part of it, the drive to breathe, the increase in heart rate, the pounding

of blood that you feel in your head [and] an *additional effect* [of] emotional terror and panic that's elicited by this primal reaction to having your oxygen supply cut off. App.840:9-19 (emphasis added). "Your heart works more strongly so that your cardiac output … increases…. It's a complicated series of interlocking mechanisms that come into play…. When oxygen supply is cut off, that's an all-hands-on-deck situation for us as organisms, as humans." App.841:3-15.

The cascading physiological reaction produces "dramatic … air hunger or shortness of breath," the medical term for which is "dyspnea" – the feeling when "you're breathing, but you still can't get enough air. Your breath feels ineffective. Your drive to breathe is going through the roof. You feel extremely short of breath, but yet you can't get enough oxygen." App.841:16-842:1. Dr. Bickler compares the sensation of air hunger triggered by hypoxia to the experience of patients he has treated that are suffering "an asthma attack, or they're having a worsening of their emphysema or pneumonia or other types of lung disease." App.841:2-5. "A lot of us might have had a near drowning experience, and we know how terrifying that is. And part of that terror response is mediated by that air hunger." App.841:14-17.

Dr. Bickler's personal experience undergoing propound hypoxia at a saturation level of 48% offers compelling context into the pain and suffering experienced by the condemned and still conscious inmate. He described his own experience, which took place in a controlled, physician monitored, clinical research environment, as "horrible." App.838:8. Dr. Bickler notes that despite being a physician scientist studying hypoxia, with full knowledge of the expected effects, he didn't "realize the degree of extreme discomfort and near terror" that he would experience. App.843:13-15. Moreover, unlike a condemned inmate, Dr. Bickler knew that he could stop the test at any point and only continued "for the sake of science and the sake of my colleagues who were doing this and watching me." App.843:15-20.[4]

_____

[4] Also notable is that Dr. Bickler does not believe he ever lost consciousness, even when his saturation levels were below 50%. App.864:3-8. He was so focused on his breath and the primal urge to breathe that he was hyperventilating and panting trying to bring in more oxygen, he recalls changes to his vision, and things being a "little bit murky" but is certain that he did not lose consciousness, despite a colleague who was administering the test observe "that [his] hand was twitching at the lower levels," a type of movement that Appellees suggest is indicative of unconsciousness. App.833:22-834:8. For an inmate being asphyxiated under the Protocol, the terror and discomfort of hypoxia will then continue to escalate until unconsciousness finally sets in.

Dr. Bickler testified that, while distinct from the pain of breaking a bone or being cut with a knife, profound hypoxia *does* inflict substantial physical pain on the condemned inmate. The International Association for the Study of Pain (IASP) defines pain as "[a]n unpleasant sensory and emotional experience associated with, or resembling that associated with, actual or potential tissue damage." App.1210; App.845:1-846:6. With hypoxia,

> The emotional and the physical part of pain are interlocked. They're together. So when we say that oxygen deprivation causes pain, we mean it's that terror response that is part of the body's reaction to it; that primal terror response that you experience when you're deprived of oxygen.

App.845:18-23. Numerous factors increase the degree of pain and suffering experienced by a condemned inmate far beyond that experienced by the volunteer subjects of Hypoxia Lab studies. In controlled studies, the subject is slowly stepped down from normal to hypoxic saturation rates. An inmate executed pursuant to the Protocol, however, experiences a far more rapid decrease in saturation, which exacerbates the effects significantly, making the "degree of discomfort much greater." App.839:1-11.

Dr. Bickler testified that, based on the eyewitness accounts he reviewed and the credible eyewitness testimony,

> it's clear to me that consciousness is persisting much longer than the State has envisioned under their current protocol … subjects are showing coordinated signs of severe distress and muscular movements that appear purposeful. Non-seizure like. The struggles, the anguish that the victims of this asphyxiation protocol have been suffering indicate to me that consciousness is persisting *many minutes into the process*; way beyond what's been proposed by the state.

App.852:8-25 (emphasis added).[5]

Dr. Bickler's conclusion – based on his knowledge of the science and physiology of hypoxia acquired over his four decades of medical and scientific experience with hypoxia – that hypoxia execution unnecessarily

---

[5] Dr. Bickler reiterated much of Dr. McAlary's testimony when discussing how he differentiated between observed movements that indicate consciousness and suffering as opposed to post-consciousness involuntary movement and agonal breathing. App.854:2-855:22. Consciousness is indicated by "the coordination of and purposeful movements of the body. So as was described [by eyewitnesses], the motions of the hands, the head, the arms, and the feet all indicate to me that consciousness is persisting. Those are all indications of consciousness, and they're the types of movements that I would not see in an unconscious person." App.853:1-12. On the other hand, "an unconscious person's movements typically lack purpose…. Movements that are caused by seizures are typically not coordinated." App.853:13-25. Further, movement that is not coordinated and typically associated with unconsciousness can also be observed in an individual that still retains some residual consciousness while in profound hypoxia, such as Dr. Bickler himself. App.855:14-22.

increases pain and conscious suffering of the condemned, was reinforced and confirmed by eyewitness reports of every nitrogen execution to date. App.858:25-859:9. Dr. Bickler believes to a degree of medical certainty that "each and every person who has been subjected to these protocols has experienced that [conscious pain and suffering], as is clear from the observations of the people who have been there." App.859:10-20. Dr. Bickler is explicit that, despite the State's expert's attempts, it is not possible to extrapolate assisted suicide case studies (Ogden) to nitrogen execution or OSHA studies. App.855:23-856:5; App.857:2-13.

## B. The Arguments Made by Appellees' Expert Are Unsupported and Should Be Rejected.

The State's expert, Dr. Antognini, is not an expert in hypoxia. Other than having treated hypoxic patients prior to his retirement from the practice of anesthesiology in 2019, he has not conducted any studies regarding hypoxia and humans. App.1117:8-11. Nor has he published any articles or studies on nitrogen hypoxia. App.1117:12-21. He has not made any medical presentations regarding nitrogen hypoxia. App.1117:15-17. Nor has he made any personal observations of any executions by nitrogen hypoxia. App.1118:12-13. In fact, Dr. Antognini has expressly refused to attend any execution. App.1121:10-17.

Unlike Dr. Bickler, none of Dr. Antognini's opinions are based upon his treatment of hypoxic patients nor his personal experience. Instead, Dr. Antognini offers two untested hypotheses largely based upon four discredited studies. He opines: (1) that the "nitrogen hypoxia system developed in Alabama, one, will cause unconsciousness within 35 to 45 seconds, and perhaps sooner, once the inmate inhales 90 to 100 percent gas" (App.1756; App.1122:22-1123:3); and (2) that the movements observed during the five previous executions are similar observations in studies he cites in his declaration. App.1094:13-1095:10; App.1097:23-1098:7. *See also* App.1739, citing J. Ernsting, *The Effect of Brief Profound Hypoxia Upon the Arterial and Venous Oxygen Tension in Man* (J. Physiol. 1963) ("Ernsting"); App.2657-2662; App.2576-2595.[6]

Unlike the State's Protocol, the limited test group of three subjects in the 1963 Ernsting study were required to exhale to an extreme, forcing

---

[6] Dr. Antognini also relied upon two other reports as the basis for his hypothesis: (1) Russel D. Ogden, *Observation of Two Suicides by Helium Inhalation in a Prefilled Environment*, American Journal of Medicine and Pathology (2010)("Ogden 1") (App.2636-2641); and (2) Def. Hearing Ex. 20, Russel D. Ogden, William K. Hamilton, and Charles Whitcher, *Assisted suicide by oxygen deprivation with helium at a Swiss right-to-die organisation* (2010)("Odgen 2") (App.2642-2647).

air from their lungs and then required to hyperventilate inert gas for a period of time. App.1123:2-1125:9. Ogden 1 was authored by a sociologist, not a medical professional. (App.1129:6-12). Dr. Antognini conceded that in both Ogden 1 and Ogden 2, there was no explanation of how the consciousness of the limited sample size of a total of six suicidal subjects was measured. App.1129:25-1130:9; App.1130:20-1132:3. Indeed, he admitted that he did not know whether any consciousness assessments were performed on any of the four suicidal subjects in Ogden 2. App.1130:4-10. He also conceded that none of the authors personally viewed the four suicidal subjects in Ogden 2, instead reviewing video tapes of suicides that occurred in Switzerland. App.1129:5-8. Notably, he further admitted that the subjects of Ogden 1 and 2 were fundamentally different than the Alabama inmates subject to the nitrogen hypoxia protocol – all of the Ogden subjects wanted to die. App.1129:6-14.

Another report Dr. Antognini relied upon is a white paper. *See* App.2576-2626 ("Miller/Mazur Paper"). A white paper is a collection of data from other sources. App.1126:9-14. It is not a clinical study. App.1126:5-8. Nitrogen is not even mentioned in the Miller/Mazur Paper. App.1126:1-4. Instead, the Miller/Mazur Paper examines the effect of

liquified gas. App.2576-2626. Dr. Antognini admitted that he had no knowledge of the qualifications of either Miller or Mazur or what methodology they used to collect the data referred to in their paper, nor did he test the data in the paper and thus did not know the reliability of Miller's and Mazur's work. App.1127:24-1128:8.

Notably, in *Hoffman* v. *Westcott,* 2025 WL 763945, *9 and n.106 (M.D. La. Mar. 11, 2025) (overruled on other grounds), the district court discredited Ernsting, Ogden 1 and 2, and the Miller/Mazur Paper. Indeed, the Court found that the "*Ernsting study supports the conclusion that* when the inhalation and exhalation variables are uncontrolled, as it will be in an execution setting, *the time to unconsciousness will be longer than 30-40 seconds*" and that Dr. Anotgnini's "hypothesis regarding time until unconsciousness remains untested and unsubstantiated." *Id.* at *9-10 (emphasis added).

Dr. Antognini also relies upon certain reports involving industrial accidents: (a) J.B. Hudnall, A. Suruda, and D.L. Cambell, *Death involving air-line respirators connected to inert gas sources* (OSHA, Jan. 1993) (App.2627-2632) (b) OSHA Report, *Deaths Involving the Inadvertent Connection of Air-line Respirators to Inert Gas Supplies*

(2010) (App.2656-2659), and (c) OSHA Report, *Accident Investigation Summary* (Feb. 20, 2020) (App.2660-2661). None of these reports reflect when any of the workers lost consciousness and, given the differences regarding the environments under which the subjects died (all subjects were working in toxic environments and unaware that they were inhaling inert gases), they are plainly different from what is occurring in the context of an execution under the State's Protocol. As Dr. Bickler testified, the reports relied upon by Dr. Antognini are not a reliable source upon which to base a medical opinion.App.885:23-886:5; App.887:2-13.

A review of the studies and papers relied upon by Dr. Antognini[7] reveal the following: (a) they are based on a limited number of subjects and are, therefore, unreliable for scientific purposes, a point Dr. Antognini concedes. App.1131 (for clinical studies, scientific studies, the larger amount of subjects in study, the more reliable the study may be);

---

[7] *See* OSHA Reports (App.2656-2659; App.2660-2661) and U.C. Luft, H.G. Clamann, and E. Opitz, *The Latency of Hypoxia Exposure to Altitude Above 50,000 Feet*, Aviation Medicine (April 1951) (App.2569-2575) and W. Ottestad, et al., *Acute hypoxia in a simulated high-altitude airdrop scenario due to oxygen*, (2017) (App.2648-2655).

(b) the methodologies employed are different than the State's Protocol (i.e. Ernsting requiring subjects to exhale and hyperventilate and Ogden 1 and 2 involving six suicides with no basis to measure how consciousness of subjects was measured); and (c) involved fundamentally different environments than what is experienced during an execution under the Alabama protocol. In short, Dr. Antognini's sources upon which he bases his hypotheses are either irrelevant or unpersuasive. Accordingly, as the *Hoffman* court concluded, Dr. Antognini's "hypothesis regarding time until unconsciousness remains untested and unsubstantiated," 2025 WL 763945 at *10, and do not effectively counter Dr. Bickler's expert opinion.

## C. The District Court Ignored Evidence of Superadded Pain.

The district court correctly noted that, "when the Eighth Amendment was adopted the Founders understood 'cruel' to include punishments '[d]isposed to give pain to others, in body or mind,'" App.2818 (quoting *Bucklew,* 587 U.S. at 130), and that "[t]he cruelty against which the Constitution protects a convicted man is *cruelty inherent in the method of punishment,* not the necessary suffering involved in any method employed to extinguish life humanely." App.2818-2819 (emphasis added) (quoting *Louisiana ex rel. Francis* v.

*Resweber*, 329 U.S. 459, 646 (1947)). "The Protocol does not implicate the Eighth Amendment unless it very likely causes "needless suffering… or cruelly *superadds* pain to the death sentence." App.2806 (citations and quotations omitted, emphasis in original). Under these standards, it was an abuse of discretion for the Court to find that "Boyd fails to identify sufficient evidence" that the conscious suffocation for two or more minutes "is attributable to some defect *in the Protocol* and not, instead, merely an accident or an inescapable consequence of death – which does not violate the Eighth Amendment." App.2792 (quoting *Baze* v. *Rees*, 553 U.S. 35, 50 (2008)).

Here, the Protocol is the defect. The Protocol is unconstitutional because, by its very nature, the Protocol causes needless suffering and superadded pain "*well beyond what is needed to effectuate a death sentence*" – specifically, the physical and psychological agony of being asphyxiated while conscious for between two and seven minutes. App.2814 (quoting *Bucklew,* 587 U.S. at 136-37 (emphasis added by the district court))[8]. This superadded pain and suffering cannot be deemed

_____

[8] As the Supreme Court has repeatedly found, methods of executions such as "dragging the prisoner to the place of execution, disemboweling,

an "accident" where the evidence incontrovertibly shows that it has occurred in each prior instance where the Protocol was employed.

The Protocol ensures that the inmate will remain conscious as the physical symptoms of asphyxiation (air hunger, shortness of breath, aching lungs elevated heart rate, blood pounding in the ears, the feeling of suffocation, of an asthma attack, of being trapped too deep underwater) feed a "fight or flight" sympathetic nervous response and attendant emotional terror. *See* App.2807-2808. The State's own expert concedes that "consciously experiencing the 'primal urge to breathe' while knowing that breathing will cause death amounts to severe emotional suffering." App.2808. The interplay between the inmate's physiological and psychological symptoms creates an ever-building feedback loop of physical and mental anguish that is wholly distinct from any other method of judicial execution and certainly not an inescapable byproduct

---

quartering, public dissection, and burning alive" all violate the Eighth Amendment. *Bucklew* v. *Precythe*, 587 U.S. 119, 130 (2019). These methods do not violate the Eighth Amendment simply because their protocols were possibly defective, they do so because they inherently constitute cruel and unusual punishment. Even if these methods contained a protocol which was executed with exact precision, they would nonetheless violate the Eighth Amendment.

of death. The evidence universally shows this to have occurred in every execution to date, for at least two minutes and up to seven, yet even at the high-end of this timeframe the district court would deem the Protocol constitutionally sound. App.2810, n.34. Death may be accomplished by any number of methods that do not involve asphyxiating a conscious human being for a prolonged period of time, and would significantly reduce the risk of pain and suffering beyond what is necessary to carry out Mr. Boyd's sentence, particularly firing squad and MAID. The Court claims that it must "consider the circumstances in which the challenged law or policy is likely to be constitutional rather than hypothetical scenarios in which the law or policy might raise constitutional concerns." App.2805 (*quoting United States* v. *Rahimi*, 602 U.S. 680, 701 (2024)).[9]

---

[9] There is nothing "hypothetical" about the Protocol's Constitutionality or application. Rather, as the evidence Boyd presented confirmed, the cruel and unusual punishment inherent in the Protocol was demonstrated time after time and in detail during the five prior executions summarized in the evidence. Moreover, the district court's observation that "the parties bitterly contest what happened during the previous nitrogen hypoxia executions" (App.2714) was also flawed. Other than self-serving characterizations and irrelevant observations, Appellees presented no evidence contradicting the evidence Boyd presented concerning the inmates' behaviors – including gasping for breath, straining against restraints, and coordinated lifting of the legs – during the prior executions. Indeed, far from disputing that these behaviors took place,

But this does not permit the district court to ignore the evidence clearly establishing that the Protocol has caused superadded pain and suffering every time that it has been employed.

## II. The District Court Erred By Finding That A Firing Squad Would Not Significantly Reduce A Substantial Risk Of Severe Pain When Compared To The State's Nitrogen Hypoxia Protocol.

Execution by firing squad has been upheld by the Supreme Court under the Eighth Amendment. *See Wilkerson* v. *State of Utah*, 99 U.S. 130, 134-35 (1878). The firing squad method of execution is currently approved by the U.S. Army and five states (Mississippi, Oklahoma, Utah, South Carolina, and Idaho). *See* Miss. Code § 99-19-51; Okla. Stat. tit. 22, § 1014; Utah Code § 77-18-113; S.C. Code § 24-3-530; and, Idaho Code § 19-2716.

---

Appellees contend that the behaviors "were 'to be expected under nitrogen hypoxia.'" App.2781 (quoting ADOC Commissioner Hamm). As envisioned, Appellees believed the Protocol would result in unconsciousness within seconds. As the district court correctly determined, however, "the time to unconsciousness is longer than the mere 'seconds' the State previously anticipated." App.2812, fn.36. Boyd has more than carried his burden.

The district court correctly concluded that the use of a firing squad is a feasible and readily implemented alternative to the Protocol. App.2822-2823. The district court also correctly concluded that, under the Protocol, "the time to unconsciousness is longer than the mere 'seconds' the State previously anticipated." App.2812, fn.36. The district court correctly "assume[d] without deciding that Dr. Bickler's opinion is correct—that an inmate subject to an execution under the Protocol who breathes more normally will become unconscious within approximately two minutes after nitrogen begins to flow" and correctly "assume[d] without deciding that Dr. McAlary's opinion that Grayson was conscious for four minutes after the nitrogen gas was introduced is correct."App.2811-2812. Despite correctly noting the facts above, however, the district court erred in determining that the use of a firing squad instead of the Protocol would not significantly reduce a substantial risk of severe pain.

## A. The District Court Incorrectly Considered The Duration Of Time An Inmate Experiences Anxiety Before The Introduction Of The Fatal Stimulus.

The district court's erroneous path commenced with the flawed assertion that the amount of fear and anxiety an inmate experiences

***before*** the introduction of the fatal stimulus is part of the relevant time period to be considered when comparing execution methods. (e.g., App.2819). The district court's error rested on its misapplication of the concept that:

> Every person condemned to die likely experiences feelings of angst, anxiety, stress, or panic. For hundreds of years, condemned inmates—regardless of the execution method— have been placed in the unenviable position of confronting their final moments. On death row, a condemned inmate arguably endures psychological pain from the date his sentence is imposed until the moment of his execution. *See In re Ohio Execution Protocol Litig.*, 881 F.3d at 450 ("Psychological pain or mental suffering is a likely result of being sentenced to death and anticipating the execution." (citation omitted)). Every method of execution also inevitably includes several steps signaling that death is imminent. The condemned inmate eats a last meal, says goodbye to loved ones, is escorted to the execution chamber, and utters his final words. It is no accident that the Protocol refers to these actions as "last" and "final." (*See, e.g.*, doc. 11-3 at 13, 17). The condemned inmate's psychological and emotional pain likely increase as each step is complete—an unfortunate "but inescapable consequence of death." *Baze*, 553 U.S. at 50. (App.2819).
>
> ***
>
> Psychological and emotional pain are thus unavoidable consequences of capital punishment under any method of execution, past or present. (*See* doc. 83 at 200:24–01:4 (Dr. Bickler explaining that in the lead up to an execution, a condemned inmate will likely have extreme anxiety)). Walking to the gallows, feeling the electric chair's straps tighten, having a target affixed to one's chest, or being secured

to a gurney each evokes strong feelings that death is imminent and results in corresponding psychological and emotional pain. But again, the Eighth Amendment does not guarantee Boyd a painless death. *See Bucklew*, 587 U.S. at 132. The Constitution does not require the State of Alabama to eliminate any and all pain—psychological or otherwise— when administering capital punishment. *See id.* (App.2819).

Improperly extrapolating from this maxim, the district court further determined that:

> Dr. Bickler acknowledges that an inmate would be expected to experience a "baseline" level of anxiety and emotional pain leading up to his execution, including the mere sight of the execution chamber and being strapped to the gurney. (*See id.* at 200:24–01:22). And Utah's firing squad protocol also carries with it a risk of psychological and emotional pain, most acutely from the time the inmate is escorted into the execution chamber and restrained in a chair, and continuing when the target is affixed over his heart and the hood is placed over his head. All the while, the inmate knows that four bullets will soon strike his heart, killing him. ***Much of the psychological and emotional pain caused by either nitrogen hypoxia or the firing squad is pain which the inmate would inevitably experience because he knows he will soon die—an experience which attends every execution and cannot be avoided***. (App.2820-2821).

The district court's consideration of the fear and anxiety experienced by an inmate during the time "he knows he will soon die" (App.2821) was improper. As Boyd has asserted from the outset, it is the prolonged terror (and fighting the primal urge to breathe) an inmate is forced to suffer ***after*** nitrogen begins to flow into the mask during an

execution and the inmate is subjected to conscious suffocation that is relevant. Any fear and anxiety experienced during the events leading up to the introduction of nitrogen – including "the mere sight of the execution chamber and being strapped to the gurney" – are irrelevant. Here, the relevant time period to compare between the nitrogen Protocol and the firing squad are the time that nitrogen enters the mask until the time of unconscious and the time that a bullet first impacts the body until the inmate loses consciousness, respectively. As the district court correctly noted, the time to loss of consciousness during a firing squad execution is "three to five" seconds. App.2816-2817. Based on basic principles of math, the "two minutes after nitrogen begins to flow" or the "four minutes after the nitrogen gas was introduced" are far greater than the "three to five seconds" under the firing squad.

### B. The District Court Erred By Finding That A Firing Squad Would Not Significantly Reduce A Substantial Risk Of Severe Pain Inherent In The Protocol.

As the district court correctly recited:

The Eighth Amendment does not come into play unless the risk of pain associated with the State's method [of execution] is 'substantial when compared to a known and available alternative.'" *Bucklew*, 587 U.S. at 134 (quoting *Glossip*, 576 U.S. at 878). Thus, Boyd must show that Utah's firing squad protocol would "in fact significantly reduce[ ] a substantial

risk of severe pain." *See Bucklew*, 587 U.S. at 127 (quoting *Glossip*, 576 U.S. at 877). "A minor reduction in risk is insufficient; the difference must be clear and considerable." *Id.* at 143. Thus, in assessing Boyd's proposed alternative, the Court must compare the risk of pain caused by the ADOC's nitrogen hypoxia protocol with the risk of pain caused by Utah's firing squad protocol—whether the pain be emotional, psychological, physical, or some combination. (App.2817-2818). (footnote omitted)).

The district court also correctly noted that the evidence at the hearing established that:

Under Utah's firing squad protocol, five riflemen simultaneously discharge their weapons, aiming at the inmate's heart. (Doc. 82-55 at 54–55, 90–91). (App.2816) One of the rifles is loaded with blanks or rubber bullets, so four (rather than five) live bullets are intended to reach the target. (Doc. 82-55 at 89–90). (App.2816). When the four bullets strike the heart, they tear the heart muscle to pieces and blow apart the tissue. (Doc. 83 at 279:21–80:25). (App.2816). This impact causes a rapid and total disruption of blood flow to the brain, and when that blood supply is stopped, loss of consciousness occurs in three to five (possibly six) seconds. (*See* doc. 82-19 at 5–7; doc. 83 at 263:16–64:3). (App.2816). Dr. Williams opines that Utah's firing squad protocol would provide a quick death with minimal pain and suffering. (Doc. 82-19 at 7, 12). (App.2816-2817).

That is where the accuracy of the district court's analysis abruptly ends. The district court's finding ignores the uncontroverted testimony of Dr. James Williams, an expert in emergency medicine, firearms and

ballistics, App.929:18-23,[10] and the only expert witness to testify about the efficacy of execution by firing squad. Indeed, despite acknowledging the evidence summarized in the quotation above, the district court went on to inaccurately determine that the Dr. Williams' report "supports *the inference* that the inmate *would* experience physical pain during the three to five seconds before he became unconscious. (*See id.* at 7 (explaining that the inmate would become unconscious in three to five seconds and would not feel pain and suffering 'thereafter'))." (App.2817) (first emphasis added, second emphasis in original)).

Dr. Williams testified that any pain and suffering experienced by inmate executed by firing squad is "relatively minor, if not in fact completely absent. The noxious sensations experienced by a person shot in the chest is obviated by the effect of neurological stunning… and very

---

[10] Dr. Williams has been an emergency room physician for over 30 years and has seen and treated over 1,000 gunshot wounds. App.942:3-7; App.1246-1247, 1250. He also is recognized by the International Association of Law Enforcement Instructors and the International Law Enforcement Educators and Trainers Association as having an expertise in firearms and ballistics. App.1246-1247. In addition to his professional observations and experience, Dr. Williams based his testimony on the State of Utah's Department of Corrections and the United States Military's firing squad protocols. App.930:10-931:12; App.1246-1262; App.1486-1623; App.1624-1645.

brief before loss of consciousness and death occur." App.1249-1250. The "natural course" experienced by surviving victims of thoracic gunshot wounds is the "sensation of a powerful blow" followed by "a prolonged numbness to the region of the gunshot wound." App.1254. The onset of pain does not begin until "several hours later," a phenomenon that is "readily explained by the known physical aspects of terminal ballistics and the consequent damage to neural tissues caused by the temporary cavity produced by the entry of the bullet into the body." *Id*. Indeed, Dr. Williams testified to his own personal experience of enduring a gunshot wound to the chest and the lack of pain he felt once he was shot. App.942-943. In his own words, "it was essentially just numb." App.943.

Accordingly, the district court erred by equating the three to five seconds of consciousness during the firing squad with the two to four minutes of post-nitrogen consciousness and suffocation that an inmate suffers under the Protocol. The district court's error warranting reversal is encapsulated in its finding that "[e]ven if the comparison of the relative risks of pain was limited to the time to unconsciousness after the nitrogen gas began to flow and after the shots were fired, it would not change the Court's conclusion." App.2821 n.43. In addition, the district court's

offhand comment that "even if Boyd had clearly shown that an inmate was conscious for **seven minutes** after the nitrogen began to flow, it would not change the Court's conclusion that Boyd has not established a substantial likelihood of success on the merits of his Eighth Amendment facial challenge to the Protocol" further magnifies this error. App.2810 n.34. Again, the unrebutted evidence shows that that the physical and psychological pain suffered by an inmate for two, four, or even seven minutes when suffocated under the Protocol is far greater than the "three to five seconds" of pain free postimpact consciousness under the firing squad.[11]

Even a cursory review of the facts found by the district court as to what transpired during each of the five prior executions confirms the flaws in the district court's determination that a firing squad does not

---

[11] In sum, the evidence before the district court showed (1) an inmate executed by a firing squad would suffer little if no pain in the 3-5 seconds before they became unconscious once shot (App.1250); (2) a firing squad "causes death with minimal pain and suffering" (App.1252); (3) an inmate being shot would feel a sensation like a severe blunt blow, like a hard tackle in a football game, with no sharp or burning sensation (App.1253-1254); and (4) a "firing squad is an efficacious means of execution for causing rapid and relatively painless death." App.931:18-20.

significantly reduce the risk of substantial pain when compared to the

Protocol. With regard to Kenneth Smith, the district court found that:

> Witnesses recounted that Smith "ma[de] violent movements" after Warden Raybon exited the execution chamber. (Doc. 83 at 14:1–6). Smith's feet and head left the gurney, his arms appeared to strain against his restraints, and he appeared to "gasp[ ] for ... air." (*Id.* at 14:2–14). One witness reported that "Smith convulsed for two minutes with seven minutes of heavy breathing as he took large breaths." (Doc. 83-38 at 2; *see also* doc. 83 at 23:13–20). Others estimated that Smith convulsed for a total of four minutes from 7:57 p.m. until 8:01 p.m. (Doc. 82-37 at 2). Smith, while strapped to the gurney, held up the "I love you" sign (in American Sign Language) with his left hand. (Doc. 83 at 27:24–28:1, 34:18–22; doc. 82-37 at 2). Smith continued to "hold[ ] on to the 'I love you' sign" during his execution. (Doc. 83 at 28:14–15, 29:15–18). App.2793-2794.

With regard to Alan Miller, the district court noted that "[d]uring the execution, Miller's whole body started to shake very intensely, and Miller's attorney described him as so obviously awake, conscious. (Doc. 83 at 52:5–13)." App.2795. The district court also noted that "[o]ne witness approximated that Miller convulsed and took 'gasping breaths of air' for five minutes. (*Id.* at 52:19–53:1). Roney noted that 'Miller gasped, shook[,] and struggled against his restraints for two minutes after the [nitrogen] gas apparently began to flow. (*Id.* at 36:24–37:1; doc. 82-36 at 1)." App.2795

For Carey Grayson's execution, the district court noted that "[s]everal witnesses, including Dr. McAlary, provided accounts of what occurred during the sixteen minutes between Code One and Code Two. (*See* doc. 83 at 103:10–22, 105:13–14)." App.2796.

After Code One, a media witness described Grayson's conduct from 6:12 p.m. to 6:13 p.m. as follows: "Grayson's hands were tightly clenched. He took several deep gasps, shaking his head vigorously. He pulled his arms against the restraints He took several deep gasps, raising his head off the gurney." Doc. 82-35 at 3; App.2796. Dr. McAlary and Schulz witnessed Grayson's execution. *See* doc. 83 at 106:7–10; App.2796. Dr. McAlary sat approximately twelve to fourteen feet away from the gurney. *Id.* at 108:21–22; App.2796. Schulz took notes during Grayson's execution on Dr. McAlary's behalf to prevent Dr. McAlary from "be[ing] distracted by looking at the clock [and] taking notes." *Id.* at 106:16–22; App.2796. Schulz's notes provide the following timeline of Grayson's execution: (1) at 6:12 p.m.,"[Grayson] appeared to breath[e] heavily as it seemed the air flow had changed ... [f]or about two minutes, he made hand gestures, clenched his hands, and struggled, while clearly still breathing"; (2) at 6:14 p.m., "[Grayson's] legs/feet lifted fairly high up off the table"; (3) from

6:15 p.m. to 6:22 p.m., Grayson continued to breathe, which Schulz described at various points as "light" or "shallow." Doc. 82-41 at 1–2; App.2797. At 6:33 p.m., the ADOC pronounced Grayson dead. Doc. 82-8 at 7; App.2797.

Dr. McAlary testified that Grayson's legs "both raised up, almost by levitation" in a "measured and consistent" manner. Doc. 83 at 115:8–12; App.2797. He estimated that Grayson's legs paused in the air for approximately ten seconds and descended "[a]t the same rate of speed." *Id.* at 115:11–16; App.2797. According to Dr. McAlary, this "coordinated activity" was a conscious movement. Doc. 83 at 115:4–16:3; App.2797. Based on his observations and medical expertise, Dr. McAlary concluded that Grayson was conscious for "at least four minutes." *Id.* at 117:10–23; App.2797.

For Demetrius Frazier, "[t]he Court heard testimony from witnesses about what occurred during those nineteen minutes" from when nitrogen began to flow until Frazier was pronounced dead. App.2799. The district court noted that:

> Schulz testified that at 6:10 p.m., Frazier "appeared to be trying to settle [and] calm himself." (Doc. 83 at 78:18–25). One media witness noted at 6:11 p.m. that Frazier's "breathing appeared to get heavier. He seemed to quiver and twitch." (*Id.*

at 62:3–6). At 6:12 p.m., Frazier "appeared distressed" while taking deep gasping breaths. (*Id.* at 79:9–11). One minute later, at 6:13 p.m., witnesses observed "Frazier's legs ... raise a few inches off the gurney." (*Id.* at 62:10–14). Schulz, who attended both Grayson's and Frazier's executions, noted that their leg lifts were similar in nature, but Frazier's legs were not lifted as high or for as long as Grayson's. (*See* doc. 83 at 79:16–22). Warden McKenzie recalled Frazier "roll[ing] his hands around ... in a circular motion." (Doc. 84 at 61:9–11). Warden McKenzie also testified that Frazier's pulse oximeter "bottomed out fairly quickly ... within a couple of minutes." (*Id.* at 61:12–21). The ADOC pronounced Frazier deceased at 6:36 p.m. (Doc. 82-11 at 3). App.2798-2799.

Finally, with regard to Gregory Hunt, the district court noted that "[o]ne media witness noted that at 5:57 p.m., one minute after Code One was issued, 'Hunt briefly shook, gasped[,] and raised his head off the gurney. (Doc. 74-3 at 2)" (App.2799) and that "[a]t 5:59 p.m., Hunt raised his feet from the gurney. (*Id.*). After Hunt lifted his legs, 'his breath became more shallow.' (Doc. 79-4 at 3)." App.2799.

Again, according to the district court, even if all of the above behaviors were conscious and took place for two, four, or even seven minutes (App.2810 n.34) it does not matter because, according to the district court, any such conscious suffocation was not significantly more painful than the "three to five seconds" of "numbness to the region of the gunshot wound" (App.1254) experienced after the bullets impact an

inmate during a firing squad execution. App.2821. That determination is flawed on its face – even if an inmate did experience pain for that three to five seconds during a firing squad – based purely on the massive time differential. The Court's error is further manifest because the unrebutted record evidence establishes that during a firing squad execution, the inmate feels no pain upon impact given that the resulting "neurological stunning" in the area of the wound persists long past the three-five seconds before consciousness is lost. App.1249. Thus, it is axiomatic that the use of a firing squad would substantially reduce the risk of severe pain as compared to the Protocol. For the district court to infer otherwise and ignore Dr. Williams' unrebutted expert opinion that the "pain and suffering from a lethal or potentially lethal gunshot wound to the chest is relatively minor, if not in fact completely absent" is reversable error.

## C. The District Court Ignored The Military Protocol

The district court's conclusion is also flawed because the district court focused exclusively on the Utah protocol and not the military protocol. Boyd presented evidence on the firing squad protocols of both

Utah and the U.S. Army.[12] Dr. Williams relied on both the Utah protocol and the U.S. Army protocol in drafting his report, attaching both protocols as exhibits thereto. App.931:3-12; App.1246-1262. As stated within Dr. Williams' report, "[i]n military justice, death by firing squad, or by gunshot wound, has been a traditional and common means of execution since at least the early 19th century." App.1256. The significance of the U.S. Army protocol lies in the training, as their training involves shooting human people, and not just inanimate targets. App.956:12-21. The military training has allowed soldiers to overcome "the natural reluctance … to kill another human being." App.957:9-12. Therefore, this training would "substantially reduce any inaccuracy that might be present in people who have not trained" in shooting a human being. App.957:13-16. Dr. Williams testified that this military training would be quite different than the firearm training for a normal peace officer. App.957:22-24.

_____

[12] The district court noted in its opinion that the U.S. Army firing squad protocol was in evidence, but failed to address whether it constituted a viable alternative notwithstanding that Dr. Williams' reviewed and relied upon that protocol in rendering his opinion that execution by firing squad causes death in a quick and painless manner. App.2816, n.38; App.1248.

### III. The District Court Erred In Finding That Medical Aid In Dying Was Not A Feasible And Readily Implemented Alternative To The Protocol.

In rejecting MAID as a feasible and readily implemented alternative, the district court found the following "shortcomings" of MAID: "it (1) requires either the condemned inmate to cooperate or that the drugs be administered by a medical professional; (2) presupposes access to pharmaceuticals and an ability to compound them; (3) has never been used as a method of execution; and (4) can take a significant time (up to twenty-four hours) to run its course." App.2824. The district court's findings regarding MAID were clearly erroneous.

The district court incorrectly noted that "[t]he most glaring problem with MAID as a method of execution concerns its proposed administration." App.2824. According to the district court, it is problematic that "the drugs [need] to be mixed with water and ingested within [one to two] minutes to avoid partial ingestion due to rapid sedation." App.2824. The district court noted, but incorrectly summarily dismissed, the fact that the undisputed evidence confirms that "MAID drugs can also be administered through a feeding or rectal tube." App.2825. According to the district court, this was problematic because

"these methods of administration would require the participation of someone with medical training, which the State is unlikely to be able to find." App.2825-2826. The Court also incorrectly found problematic that the drugs "obtained in a powder form, must then be "compounded into a mixture by a ... pharmacy" and that "this requirement begs the question: Who will compound the mixture? Neither the ADOC's staff medical team nor its medical contractor, YesCare, will do it, as they are barred from participating in executions." App.2826-2827. The district court's rationale is flawed because, as the undisputed evidence established, the State currently has non-medical staff perform similar functions, such as administering the IVs and obtaining drugs for lethal injection executions, and the State is able to find medical staff to participate in certain other aspects of the executions. App.1070:22-25. Regardless, Boyd is not required to itemize the specific function and role of each participant in his proposed alternative, or a roster of the participants.

The district court's assertion that "[t]he accessibility of drugs for use in MAID also poses a significant problem for its use as a method of execution" (App.2826) was also clearly erroneous. The unrebutted evidence established that all of the drugs used in MAID are widely "used

in routine medical practice" and "regularly obtained from commercial pharmacies across the country" (App.2826) and, regardless, there is no set requirement for what drugs must be used in the MAID protocol and the drugs can be, and have been, changed as necessary based on availability or patient requirements. (App.737 at 239:7-240:14; App.1217). To the extent that the district court's theoretical concern that the State "may nevertheless have difficulty obtaining these drugs for a judicial execution" (App.2826) played any role in the district court's determination, the reliance on this point further confirms that the conclusion was clearly erroneous. No evidence exists that any such possibility would materialize and this assertion is nothing more than conjecture and speculation. Indeed, the unrebutted evidence established that the ADOC never attempted to obtain any of the drugs used in the DDMAPh protocol (those most commonly used in MAID). App.737 at 147:6-19.

The district court's concerns about the duration of time a MAID execution could take were also clearly erroneous. Nothing in the Eighth Amendment sets a temporal deadline by which execution must take place. Rather, the key inquiry is whether the proposed alternative will

"significantly reduce a substantial risk of severe pain caused by the ADOC's nitrogen hypoxia protocol." App.2807. Here, the unrebutted evidence established that a MAID execution would do so. Dr. Carly Zapata, a doctor specializing in hospice and palliative care at the University of California in San Francisco, and the only expert witness to testify about MAID, testified that (a) MAID would be a significantly less painful alternative to execution by the State's Protocol, and (b) that MAID would be a feasible and readily implementable alternative to the Protocol. App.915:24-917:6. Dr. Zapata also confirmed that death has never occurred prior to the patient's unconscious, meaning that in every case where MAID has been used, the person was asleep and sedated prior to death and there was no indication that they suffered in any way. App.913:21-914:3.

The district court's concern that MAID "is not a method of execution authorized in any other jurisdiction" (App.2827) is also irrelevant. Nothing in the Eighth Amendment requires that the proposed alternative be authorized somewhere else. Again, the core inquiry is whether the proposed alternative will "significantly reduce a substantial risk of severe pain caused by the ADOC's nitrogen hypoxia protocol."

App.2807. More importantly, it is undisputed that Alabama was the first state to use nitrogen hypoxia for a judicial execution and that prior to Smith's execution on January 25, 2024, Alabama had never even tested the Protocol on any living being (App.737 at 135:3-136:2). Accordingly, "choosing not to be the first to experiment with a new method of execution" (App.2827) and using an "untried and untested" (App.2827) method appears not be a barrier to implementation in Alabama, nor apparently is using a "novel method" with "an insufficient (indeed, nonexistent) track record of successful use." App.2828 (internal citation and quotation omitted).

## IV. The District Court Erred By Concluding that the Equities Did Not Favor Boyd.

The district court erred in finding that Boyd engaged in dilatory litigation tactics and that he is on the wrong side of the equitable equation such that his Motion warranted denial. As noted in the first ever court decision in a nitrogen hypoxia case (Kenneth Eugene Smith) – decided less than two years ago on January 10, 2024 – "the Attorney General's office and the ADOC maintained, until just a few months ago, that nitrogen hypoxia was not a feasible and available method because

the ADOC had not yet formalized and approved an execution protocol for it." *Smith* v. *Hamm*, 2024 WL 116303 (M.D. Ala., Jan. 10, 2024).

The Court's balancing of the equities and penalization of Boyd for the timing of his suit is unsupported for, among other reasons, two principal reasons.

First, the district court treated the equitable analysis as an all or nothing determination rather than the weighing and balancing of equitable factors approach adhered to in this Circuit. The "well-worn principles of equity apply in capital cases just as in all others." *Ramirez* 595 U.S. at 434 (2022). A court's equitable discretion in handling preliminary injunctions and stays is governed by well-established principles. *Nken* v. *Holder*, 556 U.S. 418, 434 (2009). Courts examine the stay applicant's likelihood of success on the merits, whether the applicant will suffer irreparable injury without a stay, whether other parties will suffer substantial injury from a stay, and public interest considerations. *Id*. While the substantial likelihood of success on the merits prong is "generally considered the most important", courts weigh and balance the equities considering all the facts. *Schiavo*, 403 F.3d 1223, 1232 (11th Cir. 2005) ("Where the 'balance of the equities weighs heavily in favor of

granting [the injunction]' the movant need only show a 'substantial case on the merits'") (internal citations and quotations omitted); 42 Am. Jur. 2d Injunctions § 15 ("None of the factors used to determine if an injunction should issue, taken individually, is dispositive, and the strength of one factor may affect whether a necessary showing has been made with respect another factor. In other words, each factor is to be weighed and balanced in a qualitative rather than quantitative manner.").

It is equally well established that "[d]eath is a punishment different from all other sanctions in kind rather than degree." *Woodson* v. *North Carolina*, 428 U.S. 280, 303–304 (1976). For that reason, the equities in a death penalty case will almost always favor the prisoner so long as he or she can show a reasonable probability of success on the merits. *See Nken*, 556 U.S. at 434 (noting that success on the merits and irreparable injury "are the most critical" factors). Indeed, courts are entrusted with a "duty to search for constitutional error with painstaking care" in capital cases. *Kyles* v. *Whitley*, 514 U.S. 419, 422 (1995) (internal quotation marks omitted).

Thus, where the district court collapsed the equitable inquiry to conclude that because Boyd did not file his case at the earliest possible moment (and despite his not having sufficient factual support to do so), it erred and should be reversed.

Second, the district court's analysis wrongly discounts and discredits the pleading requirements, evidentiary burdens, and other practical realities that Boyd would have faced if he had filed his claim earlier, especially at the arbitrary temporal markers identified by the district court. For example, bringing a challenge in the timeframe implicitly suggested by the district court would subject Boyd to the attack of bringing a claim *too* early—which is *precisely* what happened with those who filed the first sets of challenges to nitrogen hypoxia executions. In no less than fifteen instances, the ADOC took Kenneth Eugene Smith to task for seeking a preliminary injunction based on "a highly speculative parade of horribles attempting to show *nitrogen hypoxia* is cruel and unusual punishment." *See* App.352-425 (emphasis in original). In that case, the district court adopted, in part, that line of argument, finding that "[h]is evidence and allegations amount to speculation, at best 'scientific controvers[y,]' well short "of showing that the method creates

an unacceptable risk of pain." (citing *Glossip*, 576 U.S. at 884). That an earlier-filed challenge would have failed for lack of evidence was not itself a "speculat[ive]" risk as the district court concluded, (App.2831), but a very real one. Thus, "what prevented [Mr. Boyd] from filing a lawsuit soon after the Protocol was released and then amending his complaint to add factual allegations of what occurred during nitrogen hypoxia executions as they were carried out" (App.2830) is the roadblock that the ADOC has raised, and would have raised had Boyd filed when the Court apparently believes he should, that any such claim was premature and speculative.

By contrast, with the benefit of additional time, Boyd has proffered overwhelming scientific and observational evidence confirming that nitrogen hypoxia executions under the Protocol are cruel and unusual punishment and that firing squad or MAID present feasible and readily implemented alternatives with a significant reduction in the risk of pain. The evidence adduced at the parties' two-day hearing was notably not philosophical, academic, or *speculative* —it was direct evidence from experts and thirteen lay persons alike who had observed five people die by nitrogen hypoxia. Indeed, the district court's Order extensively

reviews, discusses, and relies on that evidence that was available only to Boyd because he filed when he did. App.2785-2799.

None of the above would be true had Boyd filed on any other arbitrary date such as the day the redacted protocol was released or the day Alabama purported to be ready to implement the protocol—an effort to learn more facts before proceeding with the legal challenge that will determine whether the state will put a man to death in a manner that violates the Constitution cannot and should not be termed a dilatory litigation practice. *Ramirez*, 595 U.S. at 434–35 ("Respondents argue that Ramirez inequitably delayed this litigation by filing suit just four weeks before his scheduled execution. But this is not a case in which a litigant 'slept upon his rights.'"). By stark contrast, the Court Supreme Court has chastised litigants for a delay of six years when the inmate was already armed with all the facts they would need to bring their challenge. *Murphy* v. *Collier,* 587 U.S. 901, 908 (2019) ("As of at least 2013, Murphy and his attorneys knew or had reason to know everything necessary to assert the claim that the First Amendment and RLUIPA entitled him to have Rev. Shih at his side during his execution.") (Alito, J., dissenting). Indeed, there was no mention in the Supreme Court's 2015 *Glossip* lethal

injection decision concerning undue delay and litigation abuse, despite (i) the Supreme Court's first lethal injection decision in *Baze* being decided in 2008 and (ii) the later *Glossip* petitioners bringing their challenge to Oklahoma's substitution of midazolam for pentobarbital *after* eleven midazolam executions had already occurred in Florida and (iii) the Glossip petitioners "waiting" and moving for a preliminary injunction eight months after the first Oklahoma midazolam execution. *Glossip* at 872, 874 (2015). Although ultimately unsuccessful in their challenge, the *Glossip* petitioners had their claims fully and finally decided on the merits, after consideration of the evidence adduced at trial, and with the benefit of appellate review by the Supreme Court. Absent a reversal and remand, Boyd will get none of the above.

The Court has a gatekeeping duty to keep literal eleventh-hour phone calls to chambers urging the stop of a scheduled and imminent execution to a minimum and to encourage litigation in a timeframe that allows for adjudication on the merits; at the same time the pendulum swings too far in the opposite direction when litigants are denied relief, not because they fail to raise meritorious arguments, but because instead they – for valid reasons – did not prematurely raise a claim they could

not plausibly succeed on given the absence of available evidence. While the Supreme Court has not yet articulated a bright line, it is axiomatic that filing suit – as Boyd did here – before the execution is scheduled is a hallmark of a good-faith challenge and not a simple delay tactic.[13]

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's Memorandum of Opinion and Order (App.2771-2834) denying Boyd's Motion for Preliminary Injunction (App.58-236) and enjoin and stay his execution from proceeding on October 23, 2025 and until this action is concluded.

Respectfully submitted,

---

[13] The district court's Order does not, besides raising the additional delay to the non-party victims' family, articulate any harm to the ADOC caused by the timing of Boyd's filing, nor does it balance the relative harms. The reason for the omission is clear, had the district court balanced the harms, as required by the standard, the overwhelming and concrete harm to Boyd of denying his Motion and permitting his execution to proceed would have dramatically outweighed the theoretical and non-existent harm to the Appellees and anyone else of deferring the date for Boyd's execution, especially where he has been on death row for 32 years.

/s/ Matthew C. Moschella
Matthew C. Moschella
John C. La Liberte
SHERIN AND LODGEN LLP
One Lincoln Street, 14th Floor
Boston, Massachusetts 02111
(617) 646-2000
mcmoschella@sherin.com
jclaliberte@sherin.com
damichel@sherin.com

Dated: October 13, 2025

*Attorneys for Appellant*
*Anthony Boyd*

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the word limit of Fed. R. App. P. 32(a)(7)(B)(i) because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 11th Cir. R. 32-4, this brief contains 11,985 words.

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 MSO in 14-point Century Schoolbook font.

Dated: October 13, 2025                    By:

                                           */s/ Matthew C. Moschella*
                                           Matthew C. Moschella
                                           SHERIN AND LODGEN LLP
                                           One Lincoln Street, 14th Floor
                                           Boston, Massachusetts 02111
                                           (617) 646-2000
                                           mcmoschella@sherin.com

                                           *Attorney for Appellant*
                                           *Anthony Boyd*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 13, 2025, a true copy of the foregoing brief has been filed electronically using the Court's CM/ECF system. All parties are represented by registered CM/ECF users and will be served by the appellate CM/ECF system.

Dated: October 13, 2025

By:

*/s/ Matthew C. Moschella*
Matthew C. Moschella
SHERIN AND LODGEN LLP
One Lincoln Street, 14th Floor
Boston, Massachusetts 02111
(617) 646-2000
mcmoschella@sherin.com

*Attorney for Appellant*
*Anthony Boyd*