No. 25-13545

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

◆

**ANTHONY BOYD, Plaintiff-Appellant,**

**v.**

**COMMISSIONER, ALABAMA DEPARTMENT OF CORRECTIONS, et al.,**

**Defendants-Appellees.**

◆

On Appeal from the United States District Court for the
Middle District of Alabama (Case No. 2:25-cv-00529-ECM)

## DEFENDANTS-APPELLEES' COMBINED RESPONSE BRIEF AND OBJECTION TO EMERGENCY INJUNCTIVE RELIEF

Steve Marshall
*Alabama Attorney General*

Edmund G. LaCour Jr.
*Solicitor General*

Robert M. Overing
*Deputy Solicitor General*

Polly S. Kenny
*Assistant Attorney General*

Lauren A. Simpson
*Deputy Attorney General*

State of Alabama
Office of the Attorney General
501 Washington Avenue
Montgomery, AL 36130
(334) 242-7300
Lauren.Simpson@AlabamaAG.gov

October 15, 2025

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, the undersigned counsel certifies that the following listed persons and parties may have an interest in the outcome of this case:

1.  Antognini, Dr. Joseph F.—Defendants-Appellees' expert witness

2.  Bickler, Dr. Philip E.—Plaintiff-Appellant's expert witness

3.  Boyd, Anthony—Plaintiff-Appellant

4.  Cho-Carr, Noel Y.—Counsel for Plaintiff-Appellant

5.  Guenther, Daniel S.—Counsel for Plaintiff-Appellant

6.  Hamm, John— Defendant-Appellee, Commissioner, Alabama Department of Corrections

7.  Huguley, Gregory—Victim

8.  Kenny, Polly S.—Counsel for Defendants-Appellees

9.  La Liberte, John C.—Counsel for Plaintiff-Appellant

10. LaCour, Edmund G., Jr.—Counsel for Defendants-Appellees

11. Marks, Hon. Emily Coody—Chief Judge, Middle District of Alabama

12. Marshall, Steve—Alabama Attorney General

13. Mauldin, Dylan L.—Counsel for Defendants-Appellees

14. McAlary, Dr. Brian G.—Plaintiff-Appellant's expert witness

15. Michel, David A.—Counsel for Plaintiff-Appellant

16. Moschella, Matthew C.—Counsel for Plaintiff-Appellant

17. Overing, Robert M.—Counsel for Defendants-Appellees

18. Raybon, Terry—Defendant-Appellee, Warden, Holman Correctional Facility

19. Schwartz, Eyal—Counsel for Plaintiff-Appellant

20. Sherin and Lodgen LLP—Counsel for Plaintiff-Appellant

21. Simpson, Lauren A.—Counsel for Defendants-Appellees

22. Williams, Dr. James S.—Plaintiff-Appellant's expert witness

23. Zapata, Dr. Carly—Plaintiff-Appellant's expert witness

Undersigned also certifies that no publicly traded company or corporation has an interest in the outcome of this case or appeal.

*/s/ Lauren A. Simpson*_____

Lauren A. Simpson
*Deputy Attorney General*

**STATEMENT REGARDING ORAL ARGUMENT**

This Court should not hold oral argument. First, Boyd's execution is scheduled to take place on Thursday, October 23, 2025—eight days from this filing. Because Boyd delayed in bringing this suit, this Court's time to consider his appeal before his execution has been reduced to a few days at most. Waiting to submit the case for decision until after oral argument would further limit this Court's time to consider the case as well as the Supreme Court's time to consider any emergency motions.

Second, oral argument would not significantly aid the decisional process. The district court's order denying Boyd's motion for preliminary injunction is straightforward and amply supported by the record. *See* FED. R. APP. P. 34(a)(2).

## TABLE OF CONTENTS

Statement Regarding Oral Argument ...................................................i

Table of Authorities ...................................................................iv

Introduction ............................................................................1

Statement of the Issues................................................................5

Statement of the Case.................................................................6

    A.      Boyd's crime, conviction, and conventional appeals............................6

    B.      Boyd's first method-of-execution challenge and additional state litigation................................................................................7

    C.      Nitrogen hypoxia executions..................................................8

          i.      Kenneth Smith.............................................................9

          ii.      Alan Miller...............................................................9

          iii.     Carey Grayson..........................................................10

          iv.     Demetrius Frazier.......................................................12

          v.      Gregory Hunt ...........................................................14

          vi.     Jessie Hoffman (Louisiana) ............................................14

          vii.    Geoffrey West ..........................................................15

    D.      Boyd's present method-of-execution challenge and other execution litigation ...........................................................15

Standard of Review: Brief in Opposition ...........................................22

Summary of the Argument............................................................23

Argument................................................................................24

I.    The district court did not abuse its discretion in finding that Boyd was unlikely to succeed on the merits. .................................................. 24

    A.    Dr. Antognini's opinion was based on actual instances of profound hypoxia, including death, while Dr. Bickler's was based on pulse oximeter studies. ........................................ 24

    B.    The district court did not abuse its discretion in finding that the protocol does not superadd pain. .................................. 29

    C.    The district court did not abuse its discretion as to the firing squad. ............................................................................. 33

    D.    The district court did not abuse its discretion as to MAID ....... 40

II.    The district court did not abuse its discretion in finding that the equities weighed against injunctive relief. ........................................... 43

Standard of Review: Emergency Injunctive Relief ................................................. 48

Argument ..................................................................................................................... 48

I.    Boyd is not substantially likely to succeed on the merits. ................. 48

II.    The equities favor denial of emergency injunctive relief. ................. 49

Conclusion .................................................................................................................. 51

Certificate of Compliance ...................................................................................... 53

Certificate of Service ................................................................................................ 54

**TABLE OF AUTHORITIES**

## Cases

*Barefoot v. Estelle*, 463 U.S. 880 (1983) .................................................................48

*Baze v. Rees*, 553 U.S. 35 (2008) ...................................................... 2, 19, 32, 35, 41

*BellSouth Telecomms. v. MCI Metro Access Trans. Servs.*, 425 F.3d 964 (11th Cir. 2005) ..............................................................................................22

*Bowles v. Desantis*, 934 F.3d 1230 (11th Cir. 2019) .............................................51

*Boyd v. Dunn*, 583 U.S. 1203 (2018) ........................................................................7

*Boyd v. State*, 715 So. 2d 825 (Ala. Crim. App. 1997) .............................................7

*Boyd v. State*, CC-1994-258.61 (Talladega Cnty. Cir. Ct. Dec. 27, 2017) ...............8

*Boyd v. Thomas*, 570 U.S. 920 (2013) ......................................................................7

*Boyd v. Warden, Holman Corr. Fac.*, 856 F.3d 853 (11th Cir. 2017) ......................7

*Brooks v. Warden,* 810 F.3d 812 (11th Cir. 2016) ........................... 4, 21, 46, 48, 49

*Bucklew v. Precythe*, 587 U.S. 119 (2019) ............................... 18, 32, 35, 37, 42, 44

*Calderon v. Thompson*, 523 U.S. 538 (1998) .................................................. 47, 50

*Chavez v. Fla. SP Warden*, 742 F.3d 1267 (11th Cir. 2014) ..................................22

*Cumulus Media v. Clear Channel Commc'ns*, 304 F.3d 1167 (11th Cir. 2002) .....................................................................................................22

*Frazier v. Hamm*, 2:25-cv-00732, 2025 WL 361172 (M.D. Ala. Jan. 31, 2025) ........................................................................... 1, 12, 13, 44, 46

*FTC v. On Point Cap. Partners*, 17 F.4th 1066 (11th Cir. 2021) ...........................22

*Glossip v. Gross*, 576 U.S. 863 (2015) ..............................................................7, 42

*Grayson v. Comm'r, Ala. Dep't of Corr.*, 121 F.4th 894 (11th Cir. 2024). 11, 18, 28

*Grayson v. Hamm*, 145 S. Ct. 586 (2024)..................................................11

*Grayson v. Hamm*, 2:24-cv-00376, 2024 WL 4701875 (M.D. Ala. Nov. 6, 2024) ........................................................................ 1, 8, 11, 28

*Hill v. McDonough*, 547 U.S. 573 (2006)................................... 44, 47, 50

*Hoffman v. Westcott*, 131 F.4th 332 (5th Cir. 2025)......................... 15, 35

*Hoffman v. Westcott*, 145 S. Ct. 797 (2025) ...........................................15

*Hoffman v. Westcott*, 3:25-cv-169, 2025 WL 763945 (M.D. La. Mar. 11, 2025) ................................................................................ 14, 15

*Hunt v. Alabama*, No. 24A1192 (U.S. June 10, 2025) ...........................14

*Hurst v. Florida*, 577 U.S. 92 (2016)........................................................8

*In re Ohio Execution Protocol Litig.,* 881 F.3d 447 (6th Cir. 2018) ......................17

*James v. Sec'y, Dep't of Corr.*, 130 F.4th 1291 (11th Cir. 2025)............................47

*Jones v. Allen*, 485 F.3d 635 (11th Cir. 2007) .......................... 44, 47, 51

*Lawrence v. Florida*, 421 F.3d 1221 (11th Cir. 2005) ............................51

*Long v. Sec'y, Dep't of Corr.*, 924 F.3d 1171 (11th Cir. 2019) ..............48

*Mazurek v. Armstrong*, 520 U.S. 968 (1997)..........................................22

*McNair v. Allen*, 515 F.3d 1168 (11th Cir. 2008)...................................51

*Miller v. Marshall*, 2:24-cv-00197, 2024 WL 2946093 (M.D. Ala. June 11, 2024) ................................................................................10

*Mills v. Hamm*, 734 F. Supp. 3d 1226 (M.D. Ala. 2024) ................................. 13, 44

*Nelson v. Campbell*, 541 U.S. 637 (2004) ...............................................44

*Nken v. Holder*, 556 U.S. 418 (2009) ......................................................22

*Rutherford v. McDonough*, 466 F.3d 970 (11th Cir. 2006)....................51

*Schwab v. Sec'y, Dep't of Corr.*, 507 F.3d 1297 (11th Cir. 2007) .........................51

*Sigel v. LePore*, 234 F.3d 1163 (11th Cir. 2000).....................................................48

*Smith v. Comm'r*, 24-10095, 2024 WL 266027 (11th Cir. Jan. 24, 2024) ...............9

*Smith v. Hamm*, 144 S. Ct. 414 (2024) ....................................................................9

*Smith v. Hamm*, 2:23-cv-00656, 2024 WL 116303 (M.D. Ala. Jan. 10, 2024).....1, 9

*Thompson v. Wainwright*, 714 F.2d 1495 (11th Cir. 1983)....................................51

*Williams v. Allen*, 496 F.3d 1210 (11th Cir. 2007)................................................51

*Winter v. NRDC*, 555 U.S. 7 (2008) ......................................................................22

*Woods v. Comm'r, Ala. Dep't of Corr.*, 951 F.3d 1288 (11th Cir. 2020)...............44

**Statutes**

ALA. CODE §15-18-82 .............................................................................................42

**Rules**

FED. R. APP. P. 34.................................................................................................... i

FED. R. CIV. P. 15 ..................................................................................................45

# INTRODUCTION

Boyd has no chance of success on his Eighth Amendment claim, which failed in the district court because Boyd did not identify an alternative method of execution that significantly reduced a substantial risk of severe pain caused by the Alabama Department of Corrections' (ADOC) nitrogen hypoxia execution protocol and that ADOC lacks penological reason to reject. DE13-16:106, 110.[1]

The Middle District of Alabama has now considered five challenges to the protocol. Judge R. Austin Huffaker denied a preliminary injunction in *Smith v. Hamm*, 2:23-cv-00656, 2024 WL 116303 (M.D. Ala. Jan. 10, 2024), and *Grayson v. Hamm*, 2:24-cv-00376, 2024 WL 4701875 (M.D. Ala. Nov. 6, 2024); *Miller v. Marshall*, 2:24-cv-00197 (M.D. Ala. Aug. 5, 2024), was dismissed upon agreement of the parties following discovery. Chief Judge Emily C. Marks denied a preliminary injunction in *Frazier v. Hamm*, 2:25-cv-00732, 2025 WL 361172 (M.D. Ala. Jan. 31, 2025), and again in the present matter, DE13-16:74-137. In sum, that court is very familiar with the hypoxia protocol, the science behind it, and the allegations raised—the basis of which, as here, is often the eyewitness reports of laypeople, which Chief Judge Marks deemed "insufficiently reliable" because the witnesses do not know when the nitrogen is turned on or when the inmate loses consciousness.

---

1. Unless otherwise specified, "DE" citations are to docket entries in the present matter. Page numbers are given in accordance with the PDF pagination of the filings.

*Frazier*, 2025 WL 361172, at *11. Boyd, having delayed filing his lawsuit until after five hypoxia executions in Alabama and one in Louisiana, received a two-day evidentiary hearing on his claims, and the court also reviewed "over one thousand pages of evidence" and the parties' post-hearing filings. DE13-16:75. The court's denial of injunctive relief was not a slapdash opinion but rather the product of careful review of the testimonial and documentary evidence.

Boyd claimed that the protocol, which has now been successfully used in six executions in Alabama,[2] "causes 'emotional terror' and physiological distress" because the condemned is deprived of oxygen while conscious. *Id.* at 110. As the district court noted, "Psychological and emotional pain are…unavoidable consequences of capital punishment under any method of execution, past or present." *Id.* at 122. The court assumed for the sake of argument Boyd's experts' opinions about the length of time an inmate will remain conscious after exposure to nitrogen, *id.* at 114-15, but found that even if an inmate were slower to lose consciousness, Boyd still failed to "identify sufficient evidence that this aspect of an execution under the Protocol is attributable to some defect *in the Protocol* and not, instead, merely an 'accident' or 'an inescapable consequence of death'—which does not violate the Eighth Amendment," *id.* at 116 (citing *Baze v. Rees*, 553 U.S. 35, 50 (2008)). Further, the court disagreed with the notion that the protocol "superadds

---

2. Geoffrey West was executed on September 25, 2025.

pain by rapidly exposing the condemned inmate to high levels of nitrogen gas." *Id.* at 117. On the contrary, the evidence presented showed that with high nitrogen levels and normal breathing, the condemned will rapidly lose consciousness, and thus become insensate to discomfort. *Id.*

As for Boyd's proposed alternative methods—the firing squad and medical-aid-in-dying (MAID)—neither was helpful to his case. While the district court found that the firing squad was readily available, *id.* at 125-26, it held that Boyd failed to prove that this method was "*substantially likely* to *significantly* reduce a *substantial* risk of *severe* pain caused by Alabama's protocol," *id.* at 124. And though the court disregarded South Carolina's recent firing squad mishap because Boyd had proposed another state's protocol, *id.* at 124 n.44, Defendants-Appellees note that the execution of Mikal Mahdi is proof that the firing squad has the potential to go awry and cause great pain.

Boyd fared worse with MAID, which the court found was neither feasible nor readily available for a host of reasons, including the need for the inmate's cooperation or the assistance of medical personnel. *Id.* at 127. Moreover, the court found that ADOC had reason not to experiment with MAID, which is not used (and has never been used) as a method of execution in any jurisdiction, *id.* at 130, and that ADOC had a legitimate reason not to employ a method that can take up to twenty-four hours to cause death, *id.* at 131.

Moreover, Boyd is not entitled to equitable relief. As the district court explained, "the record evinces unreasonable delay in seeking relief," as Boyd waited until nearly two years after the hypoxia protocol was introduced—and after five hypoxia executions in Alabama and one in Louisiana—to bring his lawsuit. *Id.* at 133. The court thus concluded that his delay in filing and seeking a preliminary injunction was "'unreasonable, unnecessary, and inexcusable.'" *Id.* at 134 (quoting *Brooks v. Warden,* 810 F.3d 812, 824 (11th Cir. 2016)). While Boyd's delay in seeking injunctive relief was not as severe as those of certain other inmates on the cusp of execution, "[t]hat Boyd's litigation conduct is not 'as bad' does not undermine the Court's conclusion that he inexcusably delayed bringing this lawsuit." *Id.* at 136. Further, the district court considered the interests of the victims of Boyd's heinous crime and found that they "counsel[ed] against granting Boyd's motion." *Id.* at 135. This Court should affirm the district court's thorough order and deny Boyd's emergency stay motion (DE12).

**STATEMENT OF THE ISSUES**

1.  Whether the district court abused its discretion by denying Boyd's preliminary

    injunction motion.

2.  Whether Boyd is entitled to emergency injunctive relief.

# STATEMENT OF THE CASE

## A.    Boyd's crime, conviction, and conventional appeals

Boyd is scheduled to be executed on October 23 for the kidnapping-murder of Gregory Huguley. In July 1993, Huguley acquired $200 worth of cocaine from Boyd and two other men, Shawn Ingram and Marcel Ackles. When he failed to pay for the drugs, the sellers went looking for him on July 31, along with a fourth man, Quintay Cox, who brought a pistol. Cruising in a van that Ackles had rented, they located Huguley on the street in Anniston, Alabama. Ingram took Cox's pistol and told Huguley to get in the van; when Huguley hesitated, Ingram forced him into the back, and the van took off, followed by Cox's car.

The men stopped at a gas station, where Ackles purchased gasoline in a plastic container. As they proceeded to Munford, Boyd and Ingram forced Huguley to lie on the floor of the van as Huguley begged them, "Do not kill me. I will get your money." When they reached a baseball field, Ingram made Huguley lie on a bench, Ackles duct-taped his hands and mouth, Boyd taped his feet, and then Huguley was taped to the bench as well. With Huguley immobilized and helpless, Ingram doused him with gasoline, made a two-foot gas trail to the bench, and lit the fire. Huguley was burned alive, and Boyd and the others watched for ten to fifteen minutes until the fire went out and Huguley had perished. The men then returned to Anniston, Ingram and Boyd in the van and Ackles and Cox in Cox's car. On the way, Ackles

said to Cox, "We are all in this together. If one goes down, all go down." *Boyd v. State*, 715 So. 2d 825, 832 (Ala. Crim. App. 1997).

In 1995, Boyd was convicted of capital murder; the jury recommended 10-2 that he be sentenced to death, and the trial court concurred.[3] *Id.* 831-82. Boyd's conventional appeals concluded in June 2013 when the Supreme Court denied certiorari in habeas. *Boyd v. Thomas*, 570 U.S. 920 (2013) (mem.)

**B.     Boyd's first method-of-execution challenge and additional state litigation**

The State moved for Boyd's execution in September 2014, but before the Alabama Supreme Court could grant the motion, the State asked that the matter be held in abeyance pending the resolution of *Glossip v. Gross*, 576 U.S. 863 (2015).

The following month, Boyd filed a 42 U.S.C. §1983 complaint in the Middle District of Alabama arguing that ADOC's lethal injection protocol was unconstitutional. Following the release of *Glossip*, the State's motion to dismiss was granted. *Boyd v. Myers*, 2:14-cv-01017 (M.D. Ala. Oct. 7, 2015), DE50. This Court affirmed in May 2017, *Boyd v. Warden, Holman Corr. Fac.*, 856 F.3d 853 (11th Cir. 2017), and the Supreme Court denied cert, *Boyd v. Dunn*, 583 U.S. 1203 (2018) (mem.).

---

3. As for Boyd's codefendants, Ingram was convicted of capital murder and sentenced to death, Ackles was convicted of capital murder and sentenced to life without parole, and Cox testified against the other defendants, pled guilty to murder, and has been paroled.

In 2018, the state legislature added nitrogen hypoxia to the statutory methods of execution. Boyd timely elected hypoxia as his method of execution on June 27, 2018.

Continuing to pursue state remedies as well, Boyd filed a successive Rule 32 (postconviction) petition in January 2017, arguing that his death sentence was unconstitutional under *Hurst v. Florida*, 577 U.S. 92 (2016). The circuit court summarily dismissed the petition in December 2017. *Boyd v. State*, CC-1994-258.61 (Talladega Cnty. Cir. Ct. Dec. 27, 2017), DE27.

## C.    Nitrogen hypoxia executions

In August 2023, ADOC adopted a protocol for carrying out judicial executions by nitrogen hypoxia. The "crux" of the protocol is that it administers "pure nitrogen gas…through an industrial respirator mask" until the inmate dies. *Grayson*, 2024 WL 4701874, at *2. EKG machines and pulse oximeters monitor the inmate's condition. *Id.*

Alabama has successfully used nitrogen hypoxia to carry out the sentences of Kenneth Smith (Supreme Court denied stay), Alan Miller (settled), Carey Grayson (Supreme Court denied stay), Demetrius Frazier (did not appeal denial of injunctive relief), Gregory Hunt (did not challenge method), and Geoffrey West (did not challenge method). Louisiana used a similar hypoxia protocol to execute Jessie Hoffman (Supreme Court denied stay after Fifth Circuit vacated preliminary injunction).

### i. Kenneth Smith

Smith elected hypoxia but challenged the method on two grounds. First, Smith and multiple experts asserted that due to his PTSD, he would vomit in the mask during the execution and then choke to death on his vomit before dying of hypoxia. *See, e.g.*, *Smith v. Hamm*, 2:23-cv-00656, 2024 WL 262867, at *1 (M.D. Ala. Jan. 24, 2024). Second, Smith and one of his experts, Dr. Philip Nitschke, asserted that ADOC's mask would not produce a tight seal. *Smith*, 2024 WL 116303, at *18. Finding each risk highly speculative, the district court denied a preliminary injunction. *Id.* at *20. This Court affirmed, and the Supreme Court denied cert. *Smith v. Comm'r*, 24-10095, 2024 WL 266027 (11th Cir. Jan. 24, 2024); *Smith v. Hamm*, 144 S. Ct. 414 (2024) (mem.). Smith was executed on January 25, 2024.

### ii. Alan Miller

The State sought Miller's execution warrant on February 21, 2024. Miller, too, challenged hypoxia despite having elected it. Among other things, he argued that "a trained medical professional" should place and hold the mask, supervise the flow of nitrogen, and respond if anything "goes awry." Complaint ¶193, *Miller v. Marshall*, 2:24-cv-00197 (M.D. Ala. Mar. 9, 2024), DE1. Miller alleged that the mask would not fit his large face, that ADOC should use "medical grade nitrogen," and that a "tranquilizing medication in pill form" would "reduce thrashing." *Id.* In an order dismissing two counts but permitting Miller's Eighth Amendment claim to

proceed, the district court found the surviving allegations to be "noticeably lean on factual detail" and "barely…plausible." *Miller v. Marshall*, 2:24-cv-00197, 2024 WL 2946093, at *7 (M.D. Ala. June 11, 2024).

Miller sought preliminary injunctive relief and received copious discovery. He had a team of two major law firms and Dr. Philip Bickler (also Boyd's expert). Miller received access to ADOC personnel and documents and deposed many witnesses. He ultimately settled with the State and dismissed his lawsuit. Joint Stipulation of Dismissal, *Miller v. Marshall*, 2:24-cv-00197 (M.D. Ala. Aug. 5, 2024), DE79. Miller was executed on September 26, 2024.

### iii. Carey Grayson

After the State moved for Grayson's execution, he challenged ADOC's hypoxia protocol in June 2024. *See* Complaint, *Grayson v. Hamm*, 2:24-cv-00376 (M.D. Ala. June 28, 2024), DE1. Grayson alleged that with "proper administration," nitrogen hypoxia would cause an inmate to "lose consciousness within seconds" and die within "minutes" without any "pain or discomfort." *Id.* ¶101. But ADOC's protocol would result in "unconstitutional pain," he claimed, because (1) the inmate would not be rendered unconscious prior to the administration of nitrogen gas, causing "anguish," *id.* ¶¶105, 111; (2) excess oxygen might enter the mask and prolong the execution, *id.* ¶119; (3) the protocol does not call for a medical examination to diagnose issues like sleep apnea that could prolong the execution, *id.* ¶125; and

(4) the execution team is unqualified to monitor the pulse oximeters and EKGs used during the execution, *id.* ¶¶128-29. Grayson later amended his complaint, alleging that Smith's autopsy suggested he had experienced negative pressure pulmonary edema. Amended Complaint, *Grayson v. Hamm*, 2:24-cv-00376 (M.D. Ala. Aug. 30, 2024), DE42.

Grayson moved for a preliminary injunction and received limited expedited discovery. The district court held a comprehensive two-day hearing and received over fifty exhibits, including numerous case reports and articles on inert gas asphyxiation and media reports describing the Smith and Miller executions. *Grayson*, 2024 WL 4701875, at *3. The court heard live testimony from ten witnesses, including each side's expert, the medical examiner who conducted Smith's autopsy, and multiple State employees who witnessed the Smith and/or Miller executions. *Id.* at *4-5. Ultimately, the court denied a preliminary injunction, finding that Grayson's claim fell "well short" of the Eighth Amendment standard; Grayson presented "a speculative parade of highly unlikely events," *id.* at *19, and the State's expert, Dr. Joseph Antognini, was deemed "more credible and persuasive" than Grayson's expert Dr. Brian McAlary (also Boyd's expert), *id.* at *22. This Court affirmed unanimously in a published opinion, *Grayson v. Comm'r, Ala. Dep't of Corr.*, 121 F.4th 894 (11th Cir. 2024), the Supreme Court denied cert, *Grayson v. Hamm*, 145 S. Ct. 586 (2024) (mem.), and Grayson was executed on November 21, 2024.

### iv.    Demetrius Frazier

Like Grayson, Frazier waited until the State moved for his execution to challenge the hypoxia protocol. Complaint, *Frazier v. Hamm*, 2:24-cv-00732 (M.D. Ala. Nov. 15, 2024), DE1. His complaint relied heavily on allegations of what lay witnesses reported about the executions of Smith and Miller. As for alternatives to hypoxia, Frazier's counsel proposed two: the administration of midazolam prior to nitrogen hypoxia, or else the lethal injection of ketamine and fentanyl (the latter of which he ultimately abandoned). *Id.* at 13-16. Otherwise, his complaint was substantially similar to Grayson's.

The district court held a hearing on Frazier's motion for preliminary injunction in January 2025, at which the court heard testimony from Dr. McAlary, Dr. Antognini, and Commissioner Hamm. The court denied Frazier's a preliminary injunction, finding the lay witness accounts "insufficiently reliable." *Frazier*, 2025 WL 361172, at *11 (crediting Dr. Antognini over Dr. McAlary); *see id.* at *11 n.20 (noting that "the State present[ed] credible evidence that Smith held his breath during his execution, thereby prolonging it"). Ultimately, the court found:

> On this record, Frazier has not established that the Protocol very likely causes needless psychological suffering, superadds psychological pain, or creates a substantial risk of serious psychological harm. While the Court does not doubt that Frazier likely will experience some psychological pain before and during his execution, the Court finds that Frazier has failed to meet his burden to show that the Protocol creates a substantial risk of serious psychological harm over and above what is inherent in any execution. Consequently, Frazier fails to establish a

substantial likelihood of success on the merits of his Eighth Amendment claim.

*Id.* at \*12. As for Frazier's proposed alternative with midazolam, the court found that "Frazier's submissions are insufficient to support a finding that rendering him unconscious sooner through sedation will significantly reduce a substantial risk of severe psychological pain," *id.* at \*13, and credited the State's legitimate penological reasons for not adding a lethal injection component to a hypoxia execution, *id.* at \*13-14.

But the court denied Frazier's motion on the equities as well, emphasizing his unreasonable delay in initiating his §1983 action. *Id.* at \*15-17. As the court set forth:

> Frazier's postconviction litigation timeline reflects that he filed this action over one year after the Protocol was publicly released, and he filed his request for a preliminary injunction (1) over sixteen months after the Protocol was released; (2) almost a year after Smith's execution; (3) almost four months after Miller's execution; (4) about three months after the State moved the Alabama Supreme Court to set his execution date; (5) two months after he filed this lawsuit; (6) one month after the Alabama Supreme Court granted the State's motion to set his execution date; and (7) fewer than four weeks before the beginning of his February 6, 2025 execution timeframe. And Frazier filed his motion for preliminary injunction only after this Court prompted him to do so.

*Id.* at \*15 (footnote omitted). In closing, the court "implored members of the bar to cease the all too common 'practice of filing lawsuits and requests for stay of execution at the last minute where the facts were known well in advance.'" *Id.* at \*17 (quoting *Mills v. Hamm*, 734 F. Supp. 3d 1226, 1248 (M.D. Ala. 2024)).

Frazier did not appeal, and he was executed on February 6, 2025.

### v.    Gregory Hunt

Gregory Hunt elected nitrogen hypoxia, and the State moved to authorize his execution in March 2025. Hunt never challenged the protocol; he instead filed two successive Rule 32 petitions and a stay application in the Supreme Court, which was denied. *Hunt v. Alabama*, No. 24A1192 (U.S. June 10, 2025) (mem.). Hunt was executed on June 10, 2025.

### vi.    Jessie Hoffman (Louisiana)

Finding that no drug company would sell Louisiana the necessary drugs for lethal injection, Louisiana made nitrogen hypoxia its method of execution in spring 2024. Jessie Hoffman waited until February 2025, after Louisiana issued a death warrant, to bring a new lawsuit, challenging nitrogen hypoxia and—like Boyd—pleading the firing squad and a MAID cocktail, DDMAPh, as alternative methods. The parties engaged in expedited discovery, and the district court held an evidentiary hearing, featuring testimony from Dr. Antognini and Dr. Bickler.

The district court found that "nitrogen hypoxia does not produce physical pain" and that a person breathing nitrogen would "lose consciousness in less than one minute." *Hoffman v. Westcott*, 3:25-cv-169, 2025 WL 763945, at *8 (M.D. La. Mar. 11, 2025). The court enjoined Hoffman's execution, however, on its "common sense [belief] that the deprivation of oxygen to the lungs causes a primal urge to

breathe and feelings of intense terror." *Id.* at *9. That alleged "psychological pain," which the court never compared to the baseline emotional distress of facing execution or the distress posed by any alternatives, was enough to find that Hoffman had "clearly shown" a "substantial likelihood of success on his Eighth Amendment claim. *Id.* at *10.

The Fifth Circuit swiftly reversed, explaining that the preliminary injunction was "not just wrong" but got "the Constitution backwards, because it's premised on the odd notion that the Eighth Amendment somehow requires Louisiana to use an admittedly *more* painful method of execution." *Hoffman v. Westcott*, 131 F.4th 332 (5th Cir. 2025). The Supreme Court denied a stay, *Hoffman v. Westcott*, 145 S. Ct. 797 (2025) (mem.), and Hoffman was executed on March 18, 2025.

### vii.    Geoffrey West

Geoffrey West elected nitrogen hypoxia, and the State moved to authorize his execution in April 2025. He engaged in no execution litigation, and he was executed on September 25.

### D.    Boyd's present method-of-execution challenge and other execution litigation

The State moved for Boyd's execution for the second time on June 11, 2025. State of Alabama's Motion to Set an Execution Date, *Ex parte Boyd*, No. 1961321 (Ala. June 11, 2025). A flurry of litigation followed, including a counseled §1983

action (the present matter), and a pro se third Rule 32 petition, state civil action, mandamus petition, and §1983 action. In no court has Boyd yet found relief.

A.    Boyd initiated the present action in the Middle District of Alabama on July 16, DE13-1:13-57, and moved for preliminary injunction on July 18, DE13-1:58-236. He raised four claims in his complaint: (1) ADOC's nitrogen hypoxia protocol was cruel and unusual, in violation of the Eighth Amendment, (2) his right to due process had been violated by ADOC's failure to give him the unredacted protocol, (3) the protocol was cruel and unusual as applied to him, and (4) a "claim" for injunctive relief. Boyd opted to seek a preliminary injunction only as to the first two claims, and in his post-hearing brief, he abandoned the second. *See* DE13-16:87. As for his alternative methods to hypoxia, Boyd, like Frazier, pleaded the firing squad and the DDMAPh MAID cocktail.

The district court held an evidentiary hearing on September 4-5, at which time the court "heard nearly fifteen hours of witness testimony from expert and lay witnesses, including eyewitnesses to earlier executions under the Protocol"; the court also received more than one thousand pages of evidence. *Id.* at 75. On the first day, Boyd presented testimony from his experts, Dr. Philip Bickler, Dr. Carly Zapata, and Dr. James Williams, plus testimony from witnesses to the previous hypoxia execution, including three attorneys, Dr. McAlary, the wife of one inmate, and three journalists. He also called Cynthia Stewart-Riley, ADOC's regional coordinator for the

southern region and the former warden of Holman Correctional Facility, and introduced affidavits from other journalists. On the second day, Defendants presented ADOC Commissioner John Hamm, Holman Warden Terry Raybon, the former and present captains of the execution team, ADOC's director of medical services for quality assurance and policy, and Dr. Joseph Antognini, an anesthesiologist who has served as an expert for Defendants in prior hypoxia litigation. *See* DE13-5; 13-6; 137:3-199. Thereafter, the parties filed post-hearing briefs and replies. DE13-16:3-73; DE14-4.

      **B.**     The district court denied a preliminary injunction on October 9 on two grounds. DE13-6:74-137. ***First***, the court found that Boyd failed to establish a substantial likelihood of success on the merits. *Id.* at 105. As the court explained, "[i]t is undisputed that the Protocol does not pose a risk of physical pain akin to being cut with a knife." *Id.* at 108. Rather, Boyd claimed that the protocol created "'emotional terror,' physiological distress, and physical discomfort because inmates are unable to get sufficient oxygen into their lungs when their bodies are desperate to do so, and because they must participate in their own deaths by breathing in nitrogen." *Id.* at 108-09. But as the court noted, "'[p]sychological pain or mental suffering is a likely result of being sentenced to death and anticipating the execution,'" *id.* at 109 (quoting *In re Ohio Execution Protocol Litig.,* 881 F.3d 447, 450 (6th Cir. 2018)), and "[t]he Protocol does not implicate the Eighth Amendment unless it very likely causes

'*needless* suffering'…or 'cruelly *superadds* pain to the death sentence,'" *id.* (quoting *Grayson*, 121 F.4th at 897, and *Bucklew v. Precythe*, 587 U.S. 119, 134 (2019)). Therefore, the question was whether Boyd's alternative methods were feasible, readily available, and "would significantly reduce a substantial risk of severe pain posed by the ADOC's nitrogen hypoxia protocol," and if so, whether the State had failed to adopt them without a legitimate penological reason. *Id.* at 109-10.

Because one does not feel pain or terror while unconscious, the court considered how long the condemned would remain conscious during a hypoxia execution. *Id.* at 112. The experts disagreed; Dr. Antognini, relying on scientific literature, including reports of hypoxia suicides, estimated thirty to forty seconds, while Dr. Bickler, relying on his experience in his hypoxia lab (which is very different than the execution conditions), estimated two minutes. *Id.* at 112-14. The court declined to resolve the dispute, "assum[ing] without deciding" that Dr. Bickler's two-minute estimate was accurate and that Dr. McAlary was correct that Grayson remained conscious for four minutes. *Id.* at 114-15. Given individual variance, the court supposed that all three experts might be correct, and further noted that "the record evidence here supports a finding that the differing times to unconsciousness are largely outside of the ADOC's control and instead depend on the inmate's behavior—whether voluntary or involuntary." *Id.* at 115-16. And here, "Boyd fails to identify sufficient evidence that this aspect of an execution under the Protocol is attributable to some

defect *in the Protocol* and not, instead, merely an 'accident' or 'an inescapable consequence of death'—which does not violate the Eighth Amendment." *Id.* at 116 (quoting *Baze*, 553 U.S. at 50). The court further found that the hypoxia protocol did not superadd pain "by rapidly exposing the condemned inmate to high levels of nitrogen gas," disagreeing with Dr. Bickler:

> The record evidence establishes that the higher the level of nitrogen, and the deeper the inmate breathes, the sooner the inmate will become unconscious and thus be unable to feel pain or distress. Thus, while the degree of discomfort may be greater compared to the discomfort experienced by Dr. Bickler's lab subjects, the discomfort is limited in duration to approximately two minutes if the inmate breathes more normally, and certainly less than the ten to fifteen minutes during which Dr. Bickler's lab subjects experienced hypoxic conditions. And again, the "terror response" from being deprived of oxygen is "activated in an execution environment" because the inmate does not want to die, which is true for virtually all executions and does not implicate the Eighth Amendment[.]

*Id.* at 117-18 (citing *Baze*, 553 U.S. at 50) (citation omitted).

With that in mind, the court considered Boyd's two alternatives. First, the court found that the firing squad was feasible and readily available to ADOC. *Id.* at 125-26. However, the court found that the firing squad did not significantly reduce a substantial risk of severe pain from hypoxia because the firing squad "carries with it a risk of psychological and emotional pain, most acutely from the time the inmate is escorted into the execution chamber and restrained in a chair, and continuing when the target is affixed over his heart and the hood is placed over his head." *Id.* at 123.

Moreover, the firing squad has a real risk of physical pain not present in a hypoxia execution from the inmate being repeatedly shot in the chest. *Id.* at 124.

Second, the court found that MAID is not feasible, readily available, and significantly safer than hypoxia:

> MAID's shortcomings include that it: (1) requires either the condemned inmate to cooperate or that the drugs be administered by a medical professional; (2) presupposes access to pharmaceuticals and an ability to compound them; (3) has never been used as a method of execution; and (4) can take a significant time (up to twenty-four hours) to run its course.

*Id.* at 127. The most common route of administration for a MAID cocktail is oral, but that requires the inmate to rapidly drink the lethal drugs—and Boyd "decries the aspect of the Protocol which requires an inmate to participate in his own death by breathing in nitrogen, which he claims causes psychological pain." *Id.* at 128. Administration through a feeding or rectal tube would require the assistance of medical personnel—"which the State is unlikely to be able to find"—and even if the cocktail could be administered intravenously, that "would involve the same concerns Boyd previously expressed with regard to lethal injection[.]" *Id.* at 128-29 & n.48. The court also rightly noted that ADOC does not have a guaranteed supplier for drugs to be used in an execution or anyone to compound them into the MAID cocktail. *Id.* at 129-30. Moreover, while several states permit MAID for euthanasia, no state uses it for execution, and "the Eighth Amendment does not require states to experiment with new execution methods." *Id.* at 130. Finally, as a MAID death can take hours,

the court found that "the State has a legitimate penological reason to decline to adopt a method which would require the ADOC to monitor condemned inmates for hours after administration of the MAID drugs as part of a judicial execution." *Id.* at 131.

**Second**, the court found that the equities were not in Boyd's favor, particularly because of his untimeliness in filing. *Id.* at 132-33. Boyd waited nearly two years after ADOC introduced the hypoxia protocol to challenge it, which the court found "'unreasonable, unnecessary, and inexcusable.'" *Id.* at 134 (quoting *Brooks*, 810 F.3d at 824).

**STANDARD OF REVIEW: BRIEF IN OPPOSITION**

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. NRDC*, 555 U.S. 7, 24 (2008). Boyd "bears the burden of showing that the circumstances justify an exercise of that discretion." *Nken v. Holder*, 556 U.S. 418, 435 (2009). To succeed, Boyd must have made a "clear showing," *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997), that he has satisfied "all of these elements: (1) a substantial likelihood of success on the merits; (2) that the preliminary injunction is necessary to prevent irreparable injury; (3) that the threatened injury outweighs the harm the preliminary injunction would cause the other litigant; and (4) that the preliminary injunction would not be averse to the public interest," *Chavez v. Fla. SP Warden*, 742 F.3d 1267, 1271 (11th Cir. 2014).

"The district court's decision will not be reversed unless there is a clear abuse of discretion." *BellSouth Telecomms. v. MCI Metro Access Trans. Servs.*, 425 F.3d 964, 968 (11th Cir. 2005). This Court reviews the district court's "legal conclusions *de novo* and its findings of fact for clear error." *FTC v. On Point Cap. Partners*, 17 F.4th 1066, 1078 (11th Cir. 2021). The deferential standard for fact findings recognizes the trial court's "far better position…to evaluate th[e] evidence, and [this Court] will not disturb its factual findings unless they are clearly erroneous." *Cumulus Media v. Clear Channel Commc'ns*, 304 F.3d 1167, 1171 (11th Cir. 2002).

Boyd has no likelihood of success on the merits, and the equities strongly weigh against granting a preliminary injunction.

On the merits, Boyd needed to make a clear showing that executing him under ADOC's nitrogen hypoxia protocol is sure or very likely to result in unconstitutionally severe pain, and that the State could substantially reduce that pain relatively easily and reasonably quickly by adopting an alternative with a track record of successful use. But the primary source of "pain" he identified below was psychological, and as the district court correctly found, there is some degree of psychological discomfort in any execution, regardless of the method. Boyd also failed to show that whether an inmate lost consciousness more slowly than average was attributable to some defect in the protocol instead of to an accident, the inmate's own behavior, or the dying process.

Neither of Boyd's alternatives is feasible, readily available, and significantly safer than hypoxia. The firing squad carries with it not only the risk of psychological pain but also the risk of physical pain as the condemned is repeatedly shot in the chest. MAID has never been used as a method of execution. It requires either the inmate's participation in his own death or else the assistance of medical personnel—unlikely in an execution. It requires a source of drugs, which history shows is not guaranteed for a state department of corrections. And even if MAID were feasible

and readily available, it can take hours to kill, and ADOC has legitimate penological reasons not to adopt it.

The equities also weigh against Boyd, particularly his untimeliness in bringing this action and the public's interest in punishing capital murder.

The district court was correct to deny injunctive relief, and this Court should affirm.

<strong>ARGUMENT</strong>

## I. The district court did not abuse its discretion in finding that Boyd was unlikely to succeed on the merits.

Boyd's claim that "the evidence showed overwhelmingly that the Protocol causes physical suffering violative of the Eighth Amendment," DE11:30, is erroneous. The district court, having observed two full days of expert and lay testimony[4] and admitted over 1,600 pages into evidence, DE13-6:93, did not abuse its discretion in finding that Boyd failed to show a substantial likelihood of success on the merits.

### A. Dr. Antognini's opinion was based on actual instances of profound hypoxia, including death, while Dr. Bickler's was based on pulse oximeter studies.

At the outset, Boyd spends considerable time attempting to bolster Dr. Bickler and discredit Dr. Antognini. DE11:31-45. Both experts are anesthesiologists, and

---

4. The hearing was only scheduled for September 4. Boyd did not rest until after 6:30 p.m., however, and so the defense witnesses were offered the following day. *See* DE13-6:230.

both have testified in other hypoxia cases. Neither has observed a hypoxia execution. DE13-6:139, DE13-7:155. Appellees do not suggest that Dr. Bickler is unfamiliar with hypoxia—he runs a hypoxia laboratory at the University of California at San Francisco, DE13-6:96—and Dr. Antognini testified, "Obviously, I respect Dr. Bickler a great deal. He's done a lot of work in the field of hypoxia," DE13-7:141. But there is a vast difference between what Dr. Bickler does in the lab and what happens in an execution.

In a nitrogen hypoxia execution, the goal is to bring the inmate close to 0% oxygen as quickly as possible so as to rapidly render him unconscious and kill him. In Dr. Bickler's lab, by contrast, participants' blood oxygen levels are gradually reduced to perhaps 70% saturation while the participants are coached through the process. DE13-6:100. A gradual descent to 70% saturation, with all the potential unpleasant side effects that prolonged exposure to suboptimal levels of oxygen can bring, is not equivalent to a rapid descent to almost no oxygen. For example, someone brought into an environment with only 16% oxygen (instead of the usual 21% at sea level) might experience increased breathing, accelerated heartbeat, and dizziness as his blood oxygen saturation dropped. *See* DE13-15:141 (listing side effects of reduced-oxygen environments). If he were instead brought into an environment with 6% oxygen or less, he might experience convulsions, then death within minutes. *See id.*

The difference is like being taken to Mount Everest's base camp and gradually allowed to acclimate to the hypoxic conditions (Dr. Bickler's lab) versus being dropped on top of the mountain (execution). As Dr. Bickler testified, climbers at the summit of Everest have blood oxygen saturation levels around 50%—dangerously low—"but that involves a process of weeks of adapting to the high altitude environment." DE13-6:157. Were a subject to be taken from sea level to the summit in an instant, "their consciousness level would probably be really low." *Id.* He explained, "[A] slow ascent during a mountaineering expedition is another matter altogether. Our bodies get used to the low oxygen and adapt to it." *Id.* In Dr. Bickler's lab, participants are slowly coached down to 70% oxygen saturation, *id.* at 114, whereas in a hypoxia execution, inmates are exposed to an atmosphere with little to no oxygen within seconds and quickly lose consciousness, much like the hypothetical hapless climber dropped onto the summit of Everest.

What happens below 70% blood oxygen saturation? Dr. Bickler testified that "[b]elow a saturation of 50 percent is where consciousness starts to fluctuate," *id.*, and that when he personally dropped to 48% on one occasion, he thought he was conscious but was unaware that his hands were twitching, *id.* The pulse oximeter data from the hypoxia executions shows that the inmates rapidly dropped to dangerously low levels, even dipping below the level the machine could read. *See* DE13-11:82, 86; DE13-7:61-64. Dr. Bickler estimated loss of consciousness under

ADOC's execution conditions would occur around two minutes, though he admitted that "we're in uncharted territory" because it is impossible to ethically experiment on humans with such low levels of oxygen. DE13-6:149-50. In other words, Dr. Bickler's lab **cannot** test execution conditions because doing so would be unethical to the human participants.

And while Dr. Bickler relied on the lay witnesses' reports of the prior executions to inform his opinion, DE13-6:104, 139, most of those reports were from journalists and attorneys—not the sort of people who would have an anesthesiologist's specialized training in assessing a patient's state of consciousness and breathing patterns. *See id.* at 160. For example, while some of the journalists' accounts of the executions describe long periods of "gasping" for air, Dr. Bickler testified that agonal breathing, which "occurs when just the brainstem is active," is "gasping and irregular, and it's usually accompanied by visual signs of distress. It's almost like a fish out of water gasping for oxygen. It's very impressive when you see it because it's agonal. **It looks like the person is in agony.**" *Id.* at 163 (emphasis added); *see also* DE13-5:105-07 (Deanna Smith, "The only way I could personally describe [Smith's breathing] would be like watching somebody drown without water."). Indeed, the media accounts were "conflicting and inconsistent…and in some respects wrong," and in the 2024 *Grayson* litigation, Judge Huffaker found them to have

"highly questionable value." 2025 WL 4701875, at *20, 22; *accord Grayson*, 121 F.4th at 899 (no clear error in discounting media reports).

Since Dr. Bickler's lab cannot provide answers about what happens during a hypoxia execution, what data do we have? Those would be the studies and reports upon which Dr. Antognini relied, such as a study simulating rapid decompression in airplanes, DE13-7:117-21, another study giving participants immediate exposure to pure nitrogen, *id.* at 121-23, a paper written for Fermilab warning of the dangers of concentrated inert gases, *id.* at 123-25, an article considering OSHA investigations of hypoxic workplace incidents, *id.* at 125-27, and two articles (one coauthored by two respected anesthesiology professors) describing in detail six suicides by helium, the times until unconsciousness and death, and the motions and breathing observed during the death process, *id.* at 128-35. While Boyd claims that Dr. Antognini's sources were "discredited," DE11:41, the only party to have "discredited" them was the district court in *Hoffman*, *id.* at 43—and that court was overruled. True, Dr. Antognini's sources involve fewer participants than Dr. Bickler's studies, but a few participants under **relevant** hypoxia conditions are far more informative than are many participants under radically different conditions. Here, the "irrelevant or unpersuasive," *id.* at 45, data are Dr. Bickler's assumptions based on lay witness observations, not Dr. Antognini's review of reports of people dying from inert gas asphyxiation—who, notably, exhibited movements much like those observed during

the executions. DE13-7:135; *see* DE13-11:147 (summarizing movements observed in Ogden et al. (2010) after loss of consciousness).

### B. The district court did not abuse its discretion in finding that the protocol does not superadd pain.

Boyd claims that the district court erred in its conclusion because the hypoxia protocol "causes needless suffering and superadded pain '*well beyond what is needed to effectuate a death sentence*'—specifically, the physical and psychological agony of being asphyxiated while conscious for between two and seven minutes." DE11:46. He contends that the prior executions offer proof that the condemned remains conscious to experience air hunger, which "feed[s] a 'fight or flight' sympathetic nervous response and attendant emotional terror." *Id.* at 47. Boyd further alleges that "[o]ther than self-serving characterizations and irrelevant observations, Appellees presented no evidence contradicting the evidence Boyd presented concerning the inmates' behaviors—including gasping for breath, straining against restraints, and coordinated lifting of the legs—during the prior executions." *Id.* at 48 n.9.

*First*, Dr. Antognini testified that "it is pretty well accepted" that:

[T]he hypoxia in and of itself doesn't really—in many individuals, at least, doesn't really drive a sort of breathlessness experience; that people can have really low oxygen content or concentrations, and they don't sense it, and that's why they become unconscious. They don't know—for example, in these studies, they have the mask on, and they don't know that there's only nitrogen going through that, and they don't sense it, and then all of a sudden they pass out.

29

DE13-7:127. Hudnall et al., for example, DE13-15:150-55, discuss five years' worth of OSHA investigations in which workers accidentally plugged their respirator into an inert gas line instead of into a breathing air line and were fatally asphyxiated. The victims lost consciousness before they became aware of the danger and could self-rescue, *id.* at 152, which cuts against Dr. Bickler's theory that inmates will experience air hunger and this supposed feedback loop of terror before passing out.

***Second***, Appellees' "characterizations" of the movements lay witnesses reported during prior executions are entirely reasonable. These movements are very similar to those reported in the inert gas suicides observed by Ogden et al. after the victims lost consciousness, which included limbs extending and contracting, fine tremors, moaning sounds, a clenching fist, and rolling eyeballs "without appearance of control." DE13-11:147. In particular, Boyd's reliance on the so-called "coordinated lifting of the legs" of multiple inmates as evidence of consciousness and pain is misplaced. Dr. Antognini testified that he has observed patients in pain during surgery, and those movements are "usually not going to be a synchronous type of movement.…[U]sually whatever is occurring is going to be fairly rapid." DE13-7:136. He has never witnessed a slow, "pilates style" synchronous leg lift during surgery from a patient in pain. *Id.* Asked to explain the synchronous leg movements observed during the executions, he stated:

> [A]s I mentioned in my report, when the oxygen levels get so low, the neurons in our central nervous system begin to fire erratically, and they do not coordinate with each other. So you can get this discharge of the neurons occurring, and you can get these movements that don't appear to be what you would expect, I guess. I mean, you would not expect that type of movement, but it's synchronous. You can certainly see that described in the Ogden reports where they had these very slow movements of the extremities.[5]

*Id.* at 136-37. Dr. Antognini explained that unconscious movement is common during the dying process[6] and "appears to be" common during death by inert gas asphyxiation. *Id.* at 139. These movements should not be painful because the person is unconscious. *Id.* at 140. As for the "gasping" observed, the reports are what would be expected with agonal breathing.

In sum, then, Boyd did not present sufficient proof that (1) inmates being executed by hypoxia suffer painful air hunger or resulting terror and (2) the movement and gasping seen during prior executions was conscious or indicative of pain.

---

5. Ogden reported that in one helium suicide, the decedent lost consciousness around 12 seconds, then exhibited reflexes in her right arm and both legs around 40 seconds: "a single, slow contraction at the elbow" and "extension reflex in the legs" lasting "15 to 20 seconds." DE13-15:163. Ogden et al. reported that in another helium suicide, after the decedent lost consciousness "there were purposeless movements in the arms. The left arm extended upward and reached about involuntarily" for a time before relaxing. *Id.* at 168. In another case, after the decedent lost consciousness, her "left arm slowly extended for 10 s," followed by more contractions and another extension of the arm. *Id.* It is unsurprising, then, that similar slow extension movements would be observed during hypoxia executions.

6. *See also* DE13-6:184–86 (Dr. Zapata discussing agonal breathing and involuntary movements in dying process).

The district court considered the experts' varying opinions on time to unconsciousness, DE13-16:110-14, and ultimately declined to resolve their dispute; instead, the court "assume[d] without deciding" that Dr. Bickler's two-minute estimate and Dr. McAlary's four-minute estimate as to Grayson specifically were accurate, *id.* at 114-15. The court found Dr. Bickler's estimate more relevant than Dr. McAlary's but acknowledged that inmates might remain conscious "potentially longer than two minutes." *Id.* at 115. The court also acknowledged that some inmates might lose consciousness more rapidly by breathing deeply, whereas others might hold their breath or breathe shallowly. *Id.* at 115-16. However:

> Boyd fails to identify sufficient evidence that this aspect of an execution under the Protocol is attributable to some defect *in the Protocol* and not, instead, merely an "accident" or "an inescapable consequence of death"—which does not violate the Eighth Amendment. *See Baze*, 553 U.S. at 50. And even if an inmate is unable to breathe more normally, the resulting additional time to unconsciousness, on this record, does not approach that which would be required to show that the Protocol is facially unconstitutional. Again, the Eighth Amendment "does not demand the avoidance of *all* risk of pain in carrying out executions." *Bucklew*, 587 U.S. at 134 (emphasis added) (quoting *Baze*, 553 U.S. at 47).

*Id.* at 116-17.

Further, the court did not abuse its discretion in disagreeing with Dr. Bickler's claim that the protocol superadds pain through rapid exposure to nitrogen. *Id.* at 117. The record showed that "the higher the level of nitrogen, and the deeper the inmate breathes, the sooner the inmate will become unconscious and thus be unable to feel

pain or distress," *id.*; moreover, in an execution, an inmate is likely to feel some degree of fear or terror **regardless** of the method used, *id.* at 117-18. "Every person condemned to die likely experiences feelings of angst, anxiety, stress, or panic." *Id.* at 122.

The court's findings were reasonable based upon the testimony and the evidentiary record and should be affirmed.

## C. The district court did not abuse its discretion as to the firing squad.

The district court did not abuse its discretion in finding that the firing squad[7] would not significantly reduce a substantial risk of severe pain faced during a hypoxia execution. DE13-16:118-26.

At the outset, Appellees respectfully disagree with the court's conclusion that the firing squad is readily available to ADOC. *Id.* at 125-26. As the court noted:

> Obviously if the ADOC does not currently authorize the firing squad as an execution method, work must be undertaken to do so: for example, the state legislature would have to amend the relevant statute to include firing squad as an authorized execution method, and the ADOC would have to, at a minimum, develop a firing squad protocol. The ADOC may also have to train riflemen and/or acquire the necessary equipment to carry out a firing squad execution.

---

7. Oddly, Boyd makes much of the district court discussing the Utah protocol but not the military protocol. DE11:62-63. Dr. Williams testified the two are "very similar" with "very minor differences…primarily in the number of riflemen involved." DE13-6:203. Boyd also admits that the court noted that the military protocol was in evidence. DE11:63 n.12.

*Id.* at 126. Both Commissioner Hamm and Warden Raybon (a trained marksman) testified that ADOC's execution chamber is inappropriate for carrying out a firing squad execution, DE13-7:10, 39, 52, meaning that an entirely new facility would need to be constructed. Moreover, as Boyd conceded with respect to the military's firing squad protocol:

> The military training has allowed soldiers to overcome "the natural reluctance…to kill another human being." Therefore, this training would "substantially reduce any inaccuracy that might be present in people who have not trained" in shooting a human being. Dr. Williams testified that this military training would be quite different than the firearm training for a normal peace officer.

DE11:63 (citations omitted). This sort of military training is not what ADOC's correctional officers presently receive. *See* DE13-7:40-41. Thus, Appellees contend that the firing squad is not "readily available" to ADOC.

The district court did not abuse its discretion, however, in holding that the firing squad is not substantially safer than hypoxia. The court began by comparing the risk of pain from hypoxia to the risk of pain from the firing squad, "whether the pain be emotional, psychological, physical, or some combination." DE13-16:121. The court summarized Dr. Williams's testimony, including his opinion that when bullets "strike the heart, they tear the heart muscle to pieces and blow apart the tissue," causing loss of consciousness occurs within six seconds , *id.* at 119, and that a protocol like Utah's would "minim[ize] pain and suffering," *id.* at 120. The inmate would feel physical pain between the time of impact and the loss of consciousness.

*Id.* By comparison, Boyd alleged that hypoxia "creates a substantial risk of severe emotional suffering and physiological distress because it deprives inmates of oxygen while they are conscious," leading to breathlessness and "'emotional terror.'" *Id.*

To prevail, Boyd had to prove that the firing squad "would 'in fact significantly reduce[] a substantial risk of severe pain.'" *Id.* at 121 (quoting *Bucklew*, 587 U.S. at 127). But this was a tall order, for Alabama is not constitutionally required "to use an admittedly *more* painful method of execution." *Hoffman*, 131 F.4th at 333. Even if Boyd had proven everything he alleged about nitrogen hypoxia, there is no authority for the proposition that the Eighth Amendment demands six seconds of great physical pain, rather than (maybe) two minutes of emotional distress.

The court noted that "the Eighth Amendment does not guarantee a painless death" and that "psychological and emotional pain are inherent in any execution." *Id.* "[A] state's administration of capital punishment, which remains constitutional subject to the Eighth Amendment's protections, presumes the prospect of some pain, including psychological pain." *Id.* at 122. An inmate's "psychological and emotional pain likely increase as each step [toward execution] is complete—an unfortunate 'but inescapable consequence of death.'"[8] *Id.* (quoting *Baze*, 553 U.S. at 50). With that in mind, the court held that Boyd failed to make the necessary showing:

---

8. *See also* JOHN LAURENCE, A HISTORY OF CAPITAL PUNISHMENT 68 (1960) ("The behaviour of those who suffer death by law is much the same the world over.

The Court does not doubt that a person consciously deprived of oxygen even for two minutes under the Protocol experiences discomfort, panic, and emotional distress. But Dr. Bickler acknowledges that this "terror response" is "activated in an execution environment" because the inmate does not want to die, versus a situation in which a person willingly wants to end his or her life by asphyxiation. Similarly, Dr. Bickler acknowledges that an inmate would be expected to experience a "baseline" level of anxiety and emotional pain leading up to his execution, including the mere sight of the execution chamber and being strapped to the gurney. And Utah's firing squad protocol also carries with it a risk of psychological and emotional pain, most acutely from the time the inmate is escorted into the execution chamber and restrained in a chair, and continuing when the target is affixed over his heart and the hood is placed over his head. All the while, the inmate knows that four bullets will soon strike his heart, killing him. Much of the psychological and emotional pain caused by either nitrogen hypoxia or the firing squad is pain which the inmate would inevitably experience because he knows he will soon die—an experience which attends every execution and cannot be avoided.

*Id.* at 123-24 (citations omitted). Moreover, the firing squad carried a risk of physical pain absent in a hypoxia execution. *Id.* at 124. The court continued:

Although Boyd complains that the Protocol superadds psychological pain by requiring inmates to participate in their own executions by consciously breathing in nitrogen, the Court finds that, on this record and when compared to Utah's firing squad protocol, this circumstance does not amount to superadded pain beyond what is necessary to carry out the execution. At most, Boyd has shown that the firing squad *may* reduce the risk of psychological and emotional pain and physical discomfort caused by the nitrogen hypoxia protocol. But that is not the standard. In this preliminary injunction posture, Boyd must show that the firing squad is *substantially likely* to *significantly* reduce a *substantial* risk of *severe* pain caused by Alabama's protocol.…On this record, the Court concludes that, to the extent he proposes Utah's firing squad

---

Some enter the execution chamber with a calmness which is almost unbelievable, others in a state of collapse[.]").

protocol as an alternative method of execution, Boyd has failed to clear the high bar necessary to establish a substantial likelihood of success on his facial Eighth Amendment challenge to the Protocol.

*Id.* at 124-25.

First, Boyd complains that the court should have compared only the emotional distress after nitrogen begins to flow with that after bullets impact the chest. DE11:50-53. But the court's main point was that the delta between the inmate's *baseline* anxiety, which may well rise up to the moment of execution, and what each method adds is very small. Not severe. Although the inmate's emotional state cannot be predicted with certainty, as Dr. Bickler averred repeatedly, there may well be anxiety inherent in the process. If Boyd's argument were correct—if any additional period of emotional distress were "superadded" severe pain—then only the fastest method of execution would be constitutional, which is not the law. *Cf. Bucklew*, 587 U.S. at 132-33 (describing longer periods of physical suffering in traditional and constitutional methods of execution).

Second, a hypoxia execution does not begin at the moment the nitrogen is turned on, just as a firing squad execution does not begin at the moment the guns are shot. The larger context is not "irrelevant." DE11:53. It may be that the first stages of a firing squad execution—placing a target over the heart or a hood and a hood on the inmate—produce greater emotional distress overall than nitrogen hypoxia. Boyd did not prove otherwise. The only empirical data on the point was Dr. Williams's

testimony that a condemned facing the firing squad in Utah had *three times* a normal heart rate, DE13-6:225-26, a measure that Dr. Bickler agreed would "absolutely" suggest a "physical manifestation of stress and anxiety," *id.* at 139.

Third, considering the evidence that an inmate does ***not*** experience the sort of terror Boyd alleges during a hypoxia execution, *see supra* §I.B, the court did not abuse its discretion here. And the court stated that its opinion would not change even if the risk comparison were limited as Boyd suggests. DE13-16:124 n.43.

Boyd also claims that the court erred in finding that an inmate would likely experience several seconds of physical pain. DE11:53-62. Dr. Williams's expert report stated that consciousness would likely be lost within three to five seconds, "and the condemned person would not experience any pain or suffering thereafter." DE13-8:42. He testified that gunshot victims with (nonfatal) chest wounds, in his experience, suffer discomfort and sometimes breathing difficulty. DE13-6:201. Previously, he testified in *Hoffman* that being shot in the chest was "harder than any tackle I had ever taken in football," and that the kinetic energy from a firing squad execution would be akin to "being struck by a three-quarter-ton, fully loaded truck." *Id.* at 210. Further, Dr. Williams admitted that when he was shot as a teenager, he was not expecting to be shot, nor did the bullet hit a major organ. The bullet that entered him did not hit a bone until it apparently nicked a vertebra, though "it didn't fracture or penetrate the bone." *Id.* at 209.

While Dr. Williams admitted that the Mikal Mahdi execution in South Carolina went awry because the bullets struck Mahdi's heart "marginally," which "did not produce immediate loss of cardiac output from the left ventricle, which, of course, is the mechanism required for unconsciousness, immediate unconsciousness," *id.* at 204, he disputed the conclusion of forensic pathologist Dr. Jonathan Arden[9] that Mahdi experienced "excruciating conscious pain and suffering for about 30 to 60 seconds after he was shot," though he could offer no real evidence to the contrary, *id.* at 211-12. On this record, the district court did not abuse its discretion.

Boyd goes on to recap the witness impressions of the hypoxia executions as proof that those inmates endured suffering beyond what would be expected in a firing squad execution. DE11:57-61. But as Dr. Williams testified when asked about lay witness reports that Mahdi remained conscious for up to a minute and groaned in pain, "It was a layman's interpretation. I think it can't be taken as anything more definitive than that." DE13-6:213.

---

9. Defendants introduced two autopsy reports from the Mahdi execution into evidence. The first was the report of Dr. Bradley Marcus, who autopsied Mahdi on April 12, 2025. DE13-15:197-100. The second was the report of Dr. Jonathan Arden, *id.* at 201-08, a forensic pathologist retained by Mahdi's attorneys, who spoke with Dr. Marcus as part of his investigation and concluded that Mahdi "did experience excruciating pain and conscious suffering for about 30 to 60 seconds after he was shot," *id.* at 208.

The district court did not abuse its discretion in holding that Boyd failed to show a substantial likelihood of success on the merits as to the firing squad, and this Court should affirm.

### D. The district court did not abuse its discretion as to MAID.

The district court did not abuse its discretion in finding that MAID was not feasible, readily available, and significantly safer than nitrogen hypoxia, and that ADOC had legitimate penological reasons not to adopt it. DE13-16:126-32.

The MAID cocktail Boyd pleaded ADOC should use is DDMAPh—that is, a combination of digoxin, diazepam, morphine, amitriptyline, and phenobarbital. DE13-1:43. Dr. Zapata, Boyd's expert on MAID, testified that during a MAID procedure,[10] diazepam, morphine, and phenobarbital are used to sedate the patient, while amitriptyline and digoxin stop the heart. DE13-6:176. Patients take anti-nausea medication, then self-administer the MAID drugs. *Id.* at 175. The drugs are commonly drunk and must be consumed within two minutes to ensure that the patient does not fall asleep before taking the full dose. *Id.* at 181. In the United States, patients must be given the drugs via the digestive tract; for those unable to swallow, the drugs may be given via feeding tube or rectally. *Id.* at 180. As for the IV route, illegal in this country, Dr. Zapata testified that amitriptyline is not available in IV

---

10. Dr. Zapata testified that doctors in her field "do not classify" a MAID death "as suicide." DE13-6:189.

formulation "in a way that anybody can reliably obtain it." *Id.* She further reported that with this cocktail, the average time to sleep is six minutes but never more than ten. The average time to death is ninety-six minutes, median forty-eight minutes, *id.* at 179, though some deaths can go far longer; Dr. Zapata "believe[d] that 93 percent of deaths occur in fewer than five hours," *id.* at 192. Still, she testified that even if a MAID death took twenty-four hours, "that person was still deeply sedated and una-ware," though "it might be inconvenient for the people who are watching and wait-ing." *Id.*

The district court correctly noted MAID's shortcomings as a method of exe-cution. DE13-6:127. ***First***, MAID requires the inmate's cooperation to drink the cocktail, which the court found to be its "most glaring problem." *Id.* If the inmate, unlike Socrates, is unwilling to drink the hemlock (and do so quickly), then ADOC has no recourse. A MAID patient presumably wants to end his life; a death row inmate generally does not. If ADOC wanted to use a route that did not require the inmate's cooperation, such as through a nasogastric tube or the rectum, they would need the assistance of qualified medical personnel, which the court correctly noted "the State is unlikely to be able to find." *Id.* at 129 (citing *Baze*, 553 U.S. at 64 (Alito, J., concurring)). The court found Boyd's suggestion that ADOC might use IV ad-ministration unpersuasive, both because of Dr. Zapata's testimony on the subject and because it "would involve the same concerns Boyd previously expressed with regard

to lethal injection" in his earlier §1983 action. *Id.* at 128-29 n.48. Finally, the court found it "inconsistent for Boyd to endorse MAID, which requires a greater level of inmate cooperation," while claiming that forcing an inmate to "participate in his own death by breathing in nitrogen…causes psychological pain." *Id.* at 128.

**Second**, the court correctly found that ADOC may not have access to the drugs. While they may be routinely used in medical practice, obtaining them for *execution* is a rather different matter, as the Supreme Court has noted. *Id.* at 129 (citing *Glossip*, 576 U.S. at 869-71). Boyd deems this "conjecture and speculation" and asserts that ADOC has not attempted to obtain the DDMAPh drugs, DE11:66, but this claim both breezes past the established history of difficulty in obtaining drugs for execution and tries to put the blame on ADOC for not seeking out drugs for a method of execution illegal under state law. *See* ALA. CODE §15-18-82.

**Third**, the court correctly found that MAID has never been used as a method of execution in any state, and ADOC is not obligated to "experiment with new execution methods." DE13-16:130 (quoting *Bucklew*, 587 U.S. at 142). Boyd argues that Alabama pioneered nitrogen hypoxia, DE11:68, but that is irrelevant to the inquiry. The state legislature made the decision to authorize hypoxia as a method of execution and charge ADOC to develop a protocol—it was not compelled to do so by the Eighth Amendment.

***Fourth***, the court correctly noted that a MAID death can take hours. "While this situation may be reasonable in the clinical setting in which MAID deaths ordinarily occur, the State has a legitimate penological reason to decline to adopt a method which would require the ADOC to monitor condemned inmates for hours after administration of the MAID drugs as part of a judicial execution." DE13-16:131. Indeed, a 2025 study comparing various MAID protocols found that at least one DDMAPh death took ***67.5 hours***. DE13-11:111 (citing Patrick Macmillan et al., *The Pharmacology of Aid in Dying: From Database Analyses to Evidence-Based Best Practices*, 28:4 J. PALLIATIVE MED. 492-98 (2025)). Boyd is correct that the Eighth Amendment does not prescribe a "temporal deadline" for execution, DE11:66, but neither does it require a state to adopt a method that can take hours, if not days, to complete.

The district court did not abuse its discretion in holding that Boyd failed to show a substantial likelihood of success on the merits as to MAID, and this Court should affirm.

## II.     The district court did not abuse its discretion in finding that the equities weighed against injunctive relief.

Looking beyond Boyd's unlikeliness to succeed on the merits of his claim, the district court did not abuse its discretion in holding that the equities weighed against the grant of preliminary injunctive relief. *See* DE13-16:132-37.

The equitable factor that counted most heavily against Boyd was his untimeliness in filing, which Chief Judge Marks, citing precedent from the Supreme Court and this Court, has warned against in execution litigation. *Mills*, 734 F. Supp. 3d at 1244-48; *Frazier*, 2025 WL 361172, at *15-17; *see, e.g.*, *Hill v. McDonough*, 547 U.S. 573, 584 (2006) (court must "apply 'a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay'"); *Bucklew*, 587 U.S. at 150 ("Last-minute stays should be the extreme exception, not the norm, and 'the last-minute nature of an application' that 'could have been brought' earlier, or 'an applicant's attempt at manipulation,' 'may be grounds for denial of a stay.'"); *id.* at 151 ("[F]ederal courts 'can and should' protect settled state judgments from 'undue interference' by invoking their 'equitable powers' to dismiss or curtail suits that are pursued in a 'dilatory' fashion or based on 'speculative' theories."); *Jones v. Allen*, 485 F.3d 635, 638 (11th Cir. 2007) ("When considering a motion to stay an execution, we must apply 'a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay,' given the State's significant interest in the enforcement of its criminal judgments.") (quoting *Nelson v. Campbell*, 541 U.S. 637, 650 (2004)); *Woods v. Comm'r, Ala. Dep't of Corr.*, 951 F.3d 1288, 1293 (11th Cir. 2020) (quoting *Bucklew* and *Jones*).

Boyd elected nitrogen hypoxia as his method of execution on June 27, 2018. DE13-5:49. Thereafter, he began expressing his opposition to hypoxia in his quarterly column in *On Wings of Hope*, *e.g.*, DE13-3:81 (issue 25:2, April-June 2021, comparing hypoxia to Nazi gassing), and especially after Smith's execution in January 2024, *id.* at 93-94 (issue 28:1, Jan.-Mar. 2024, calling the execution "Hitleresque" and "torturous, barbaric, heinous, cruel, atrocious, careless, and reckless"). Yet despite his awareness and evident dislike of the method of execution he chose, Boyd waited until July 2025—after five hypoxia executions in Alabama and one in Louisiana, and after the State had moved for his own execution—to file his complaint. Asked about the delay, Boyd answered under oath that he waited due to "just solely talking to [his] lawyers." DE13-15:37. This is pure gamesmanship.

In light of the foregoing, the district court did not abuse its discretion in finding that Boyd's delay in filing was unreasonable:

> [T]he State released its nitrogen hypoxia protocol in August 2023, nearly two years before Boyd brought this lawsuit. Boyd argues that this delay is excusable because he needed data from actual nitrogen hypoxia executions to present his case. But he does not explain what prevented him from filing a lawsuit soon after the Protocol was released and then amending his complaint to add factual allegations of what occurred during nitrogen hypoxia executions as they were carried out. *See* FED. R. CIV. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires.").
>
> But even assuming this explanation supplies a reasonable basis for Boyd to have waited some additional time, Boyd still unreasonably delayed seeking relief from the Court. Boyd did not act until approximately eighteen months after Smith's execution, ten months after

Miller's, eight months after Grayson's, and five months after Frazier's. Boyd acknowledges that Smith's January 2024 execution provided information about how the Protocol operates in practice, as did Miller's, Grayson's, and Frazier's respective executions. Boyd nevertheless sat idle until July 16, 2025—more than five months after Frazier's execution and over a month after the State moved to set Boyd's execution date. The Court concludes that Boyd's delay in bringing this action and seeking a preliminary injunction was "unreasonable, unnecessary, and inexcusable." *Brooks v. Warden*, 810 F.3d 812, 824 (11th Cir. 2016) (citation omitted); *see also Frazier*, 2025 WL 361172, at *16 ("[Frazier] argued that he was waiting for other nitrogen hypoxia executions to occur to see how the Protocol operates in practice. Assuming this explanation is reasonable, it does not justify Frazier's waiting to act until nearly ten months after Smith's execution and two months after Miller's execution….").

DE13-16:133 (citations omitted).

Boyd's claim that had he filed earlier, his case might have failed due to lack of evidence, DE11:71-72, is unavailing. Had Boyd initiated his lawsuit soon after Smith's execution, then his case would have proceeded along the standard path of any civil action, including full discovery. He would have had the opportunity to amend his pleadings, as the district court rightly noted. And had he filed at that time, he would not have thrust the district court (and now this Court) into a compressed emergency timeframe. While Boyd is correct that this Court "has a gatekeeping duty to keep literal eleventh-hour phone calls to chambers urging the stop of a scheduled and imminent execution to a minimum and to encourage litigation in a timeframe that allows for adjudication on the merits," *id.* at 74, a litigant need not wait until the literal last moment to be untimely with his filings.

But the district court did not write about timeliness alone when considering the equities. The court also considered "the interests of the victims of Boyd's crime—the State, Gregory Huguley, and Huguley's friends and family"—in the timely enforcement of his sentence. DE13-16:135. As the court explained:

> Boyd was convicted and sentenced to death for his participation in Huguley's gruesome murder over thirty years ago. Balancing his delay against his victims' interest in the timely enforcement of his sentence, Boyd fails to show that equity favors entry of a preliminary injunction, and these considerations also counsel against granting Boyd's motion.

*Id.* Boyd claims there is no harm in delaying his execution a little longer, as he "has been on death row for 32 years." DE11:75 n.13. But that is precisely the point: Boyd murdered Huguley in 1993, and his appeals were exhausted in 2014. It is long past time for Boyd to receive the punishment he is due for his crime. And while Boyd tries to minimize the harm to the "non-party victims' [sic] family," *id.*, the Supreme Court and this Court have recognized the real interest that the State and the families of victims have in the timely execution of sentences. *E.g.*, *Hill*, 547 U.S. at 584 ("Both the State and the victims of crime have an important interest in the timely enforcement of a sentence.") (citing *Calderon v. Thompson*, 523 U.S. 538, 556 (1998)); *James v. Sec'y, Dep't of Corr.*, 130 F.4th 1291, 1296 (11th Cir. 2025) (quoting *Hill*); *Jones*, 485 F.3d at 638 (same).

The district court did not abuse its discretion in holding that the equities weighed against a stay of execution, and this Court should affirm.

Boyd has also filed an emergency motion for stay of execution. DE12. To be entitled to emergency injunctive relief, the movant must establish that "'(1) he has a *substantial* likelihood of success on the merits; (2) he *will* suffer irreparable injury unless the injunction issues; (3) the stay would not substantially harm the other litigant; *and* (4) if issued, the injunction would not be adverse to the public interest.'" *Brooks*, 810 F.3d at 818 (citations omitted; emphasis added). A stay of execution is an extraordinary equitable remedy "not to be granted unless the movant clearly establishes the burden of persuasion as to each of the four prerequisites." *Sigel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (citation modified). Courts apply a "strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay." *Long v. Sec'y, Dep't of Corr.*, 924 F.3d 1171, 1176 (11th Cir. 2019). Lastly, a motion for a stay of execution requires "careful assessment." *Barefoot v. Estelle*, 463 U.S. 880, 896 (1983).

## ARGUMENT

Boyd has neither the law nor the facts on his side in this litigation, and his filings have been untimely. The Court should deny emergency injunctive relief.

## I.      Boyd is not substantially likely to succeed on the merits.

As set forth above, Boyd failed to show a substantial likelihood of success on the merits of his Eighth Amendment claim. While Boyd contends that the prior hypoxia executions show evidence of suffering—inmate movements and gasping, alleged proof of conscious suffocation—those types of movements and irregular breaths have been observed in inert gas suicides, and agonal breathing, which may be disturbing to the untrained witness, is not uncommon as part of the death process. Even crediting (though not fully accepting) Boyd's witness's estimation of how long an inmate will remain conscious, the district court correctly found that the time to unconsciousness, "on this record, does not approach that which would be required to show that the Protocol is facially unconstitutional." DE13-16:116-17. Moreover, the firing squad is not significantly safer than nitrogen hypoxia, and not only is MAID not feasible, readily available, and significantly safer than hypoxia, but ADOC has legitimate penological reasons not to adopt a novel method of execution that can last for hours to days.

Boyd has no chance of success on the merits, so no stay should issue.

## II.     The equities favor denial of emergency injunctive relief.

The Court must evaluate whether Boyd will suffer irreparable harm without the requested injunction and whether such injunction would substantially harm the State and the public interest. *Brooks*, 810 F.3d at 818. The balance of the equities favors the State. Boyd's civil action was untimely filed, he has not shown a

substantial threat of irreparable harm, and preventing his execution would be adverse to the public interest.

**First**, as the district court thoroughly explained, DE13-16:132-35, there is no reason that Boyd could not have initiated his lawsuit in time to pursue normal civil litigation instead of thrusting the State and the Federal judiciary into the all-too-familiar last-minute emergency execution posture. Boyd publicly stated his dislike of nitrogen hypoxia at least as early as 2021, *see* DE13-3:81, and he expressed his horror with the method after the Smith execution in January 2024, *see id.* at 93-94. He could have filed then but did not. The only reason he waited for a year and a half after Smith's execution to file suit was "just solely talking to [his] lawyers." DE13-15:37. This was patently unreasonable. As the Supreme Court explained in *Hill*, "[a] court considering a stay must also apply a strong equitable presumption against granting relief where the claim could have been brought at such a time as to allow consideration of the merits without requiring a stay." 547 U.S. at 574-75. This is precisely the scenario Boyd has created.

**Second**, Boyd has not shown that he will suffer irreparable harm absent a stay of execution. The State inflicts no cognizable harm, let alone irreparable harm, when it carries out a lawful and just sentence. To the contrary, punishing the guilty is the fulfillment of the public's "moral judgment." *Calderon*, 523 U.S. at 556.

***Third***, preventing the State from carrying out Boyd's long overdue sentence would be adverse to the public interest. Boyd has been on death row for more than three decades, and his sentence was rightly imposed. As this Court has explained:

> Stays of executions where the conviction and sentence are valid impose a cost on the State and the family and friends of the murder victim. As we have stated many times, "[e]ach delay, for its span, is a commutation of a death sentence to one of imprisonment." *Thompson v. Wainwright*, 714 F.2d 1495, 1506 (11th Cir. 1983); *see McNair v. Allen*, 515 F.3d 1168, 1176 (11th Cir. 2008) (same); *Jones v. Allen*, 485 F.3d 635, 641 (11th Cir. 2007) (same); *Williams v. Allen*, 496 F.3d 1210, 1214 (11th Cir. 2007) (same); *Schwab v. Sec'y, Dep't of Corr.*, 507 F.3d 1297, 1301 (11th Cir. 2007) (per curiam) (same); *Rutherford v. McDonough*, 466 F.3d 970, 978 (11th Cir. 2006) (same); *Lawrence v. Florida*, 421 F.3d 1221, 1224 n.1 (11th Cir. 2005) (same).

*Bowles v. Desantis*, 934 F.3d 1230, 1248 (11th Cir. 2019). Boyd's conventional appeals were concluded in 2013. He has been represented by competent counsel for decades. Boyd's present claims are meritless, and further delay to the execution of his sentence would not serve any public benefit. His efforts at gamesmanship through untimely last-minute litigation should not be rewarded.

## CONCLUSION

This Court should affirm the district court's denial of Boyd's motion for preliminary injunction and deny a stay of execution.

Respectfully submitted,

Steve Marshall
*Alabama Attorney General*

Edmund G. LaCour Jr.
*Solicitor General*

Robert M. Overing
*Deputy Solicitor General*

Polly S. Kenny
*Assistant Attorney General*

**_s/ Lauren A. Simpson_**
Lauren A. Simpson
*Deputy Attorney General*
*Counsel for Defendants-Appellees*

October 15, 2025

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitations set forth in FED. R. APP. P. 32(a)(7)(B)(i) because it contains 12,571 words, including all headings, footnotes, and quotations, and excluding the parts of the brief exempted under FED. R. APP. P. 32(f) and 11th Cir. R. 32-4.

2. In addition, this brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

/s/ *Lauren A. Simpson*
Lauren A. Simpson
*Deputy Attorney General*
*Counsel for Defendants-Appellees*

## CERTIFICATE OF SERVICE

I hereby certify that on October 15, 2025, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which will serve electronic notice upon counsel of record.

*/s/ Lauren A. Simpson*_____
Lauren A. Simpson
*Deputy Attorney General*
State of Alabama
Office of the Attorney General
501 Washington Avenue
Montgomery, AL 36130-0152
(334) 242-7300
Lauren.Simpson@AlabamaAG.gov