UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

**CAPITAL CASE**

No. 25-13545

_____

ANTHONY BOYD,
*Plaintiff-Appellant*,

*v.*

COMMISSIONER, ALABAMA DEPARTMENT OF CORRECTIONS,
HOLMAN CF WARDEN,
*Defendants-Appellees*.

_____

On Appeal from the United States District Court
for the Middle District of Alabama
(D. C. Civil Action No. 2:25-cv-00529)
District Judge: Honorable Emily Coody Marks, Chief Judge

_____

**APPELLANT'S REPLY BRIEF**

**CAPITAL CASE – EXECUTION SCHEDULED OCT. 23, 2025**

_____

Matthew C. Moschella
John C. La Liberte
SHERIN AND LODGEN LLP
One Lincoln Street, 14th Floor
Boston, Massachusetts 02111
(617) 646-2000
mcmoschella@sherin.com
jclaliberte@sherin.com

*Attorneys for Appellant Anthony Boyd*

**CERTIFICATE OF INTERESTED PERSONS**

In compliance with Eleventh Circuit Rule 26.1-2(b), undersigned counsel certifies that the Certificate of Interested Persons contained in Appellant's Opening Brief filed on October 13, 2025 remains complete to the best of counsel's knowledge.

Respectfully submitted,

Dated: October 16, 2025

/s/ Matthew C. Moschella
Matthew C. Moschella
SHERIN AND LODGEN LLP
One Lincoln Street, 14th Floor
Boston, Massachusetts 02111
(617) 646-2000
mcmoschella@sherin.com

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ...........................................i

TABLE OF CONTENTS ............................................................ii

TABLE OF AUTHORITIES...................................................... iii

ARGUMENT .....................................................................1

I.   Appellees' Obsession with Prior Unrelated Litigation is Irrelevant. 1

II.  The Protocol Superadds Physical Pain and Not Merely an "Additional Period of Emotional Distress." ................................2

III. Appellees' Arguments Concerning Pre-Execution Fear and Anxiety Highlight the District Court's Error .........................................8

IV.  Firing Squad Executions Result in Near Instantaneous Unconsciousness and Relatively Painless Death, Unlike the At Least Two Minutes of Pain and Severe Emotional Suffering Under the Protocol. ..................................................................11

V.   The District Court's Concerns with Medical Aid in Dying are Erroneous. ..................................................................16

VI.  The Equities Favor Boyd.................................................17

CONCLUSION ..................................................................19

CERTIFICATE OF COMPLIANCE.......................................21

CERTIFICATE OF SERVICE...............................................22

# TABLE OF AUTHORITIES

<u>Cases</u>

*Baze v. Rees*, 553 U.S. 35, 49 (2008) ......................................................15

*Estelle v. Gamble*, 429 U.S. 97, 103 (1976) ...........................................15

*Furman v. Georgia,* 408 U.S. 238, 331 (1972) .......................................15

*Grayson v. Warden, Comm'r Alabama Doc*, 869 F.3d 1204, 1217, fn. 31

   (11th Cir. 2017) ...............................................................................iii, 10

*In re Kemmler*, 136 U.S. 436, 447 (1890) ...............................................15

*In re Ohio Execution Protocol Litig.*, 881 F.3d 447, 450 (6th Cir. 2018)..9

<u>Other Authorities</u>

Moser P. *Out of Control? Managing Baseline Variability in*

   *Experimental Studies with Control Groups*. Handb Exp Pharmacol.

   2020;257:101-117 ...............................................................................11

# ARGUMENT

## I. Appellees' Obsession with Prior Unrelated Litigation is Irrelevant.

Perhaps to suggest that the constitutionality of nitrogen hypoxia executions is well settled, Appellees recount the litigation surrounding inmates previously executed using nitrogen hypoxia. *See* Response at 8-15. Appellees are wrong.

Appellees' focus on the courses and outcomes of prior unrelated cases not involving Boyd is irrelevant and further confirms that Appellees are seeking to litigate any case but this one. While the events that transpired *at prior executions* are clearly critical and relevant to this case, the pre-execution claims and litigation by other inmates are not. Appellees devote six pages of their brief (Response at 9-15) to summarizing the course of three prior cases involving other inmates. It matters not, however, what happened procedurally in those cases, who represented the inmates, or what the outcomes of those cases were. None of those cases involved the "nearly fifteen hours of witness testimony from expert and lay witnesses, including eyewitnesses to earlier executions under the Protocol" combined with the "over one thousand pages of evidence" that comprised the record in this case. *See* App.2772.

1

None of those cases involved extensive firsthand observations by numerous witnesses to prior executions, the only expert who has actually observed an execution (Dr. McAlary, who testified only as a fact witness in the *Frazier* case), or experts on MAID, or experts on the firing squad. All of that evidence taken together – which was only available due to Boyd waiting until the necessary evidence existed – establishes overwhelmingly that (a) the Protocol superadds pain, and (b) both the firing squad and MAID are feasible and readily implemented alternatives that would significantly reduce the risk of severe pain.

Moreover, as Appellees readily acknowledge, only three (Smith, Grayson, and Frazier) of the prior six Alabama nitrogen executions involved stay litigation concerning the Protocol. Three of the inmates (Miller, Hunt, and West) either did not press their claims and settled or did not litigate at all. *See* Response at 10, 14-15. Most importantly, ***this Court*** has not squarely addressed the issues in this case and based on this record.

## II. The Protocol Superadds Physical Pain and Not Merely an "Additional Period of Emotional Distress."

It was clear error for the district court to discount the physical pain imposed by the Protocol above and beyond what is necessary to

accomplish the inmate's death. Appellees make this same error, and their brief confirms that, like the district court, they minimize or ignore the overwhelming evidence to the contrary. The experience of hypoxia is akin to drowning. As Dr. Bickler testified, subjects in his laboratory studies report feeling like they were drowning, using that specific word. App.879:2-8. "That's how you feel when your oxygen level is near 70%." *Id.* Based on his unparalleled expertise in hypoxia, Dr. Bickler predicted that execution by nitrogen hypoxia would be painful and inhumane. Dr. Bickler testified that, based on his review of eyewitness accounts and hearing testimony describing the prior executions, "[u]nfortunately, my predictions have played out in virtually every one of these executions. Truly disappointing for me to say that we sounded the alarm on what was going to happen with this, and our worst fears have been realized." App.838:14-20.

The evidence clearly establishes that the physiological effects of hypoxia are physically painful, which drives the psychological "terror effect" that flows from this physical pain. As Dr. Bickler testified, when the carotid bodies sense that oxygen levels are falling, they send impulses to the brain that "drive a couple of things. One is they demand that we

breathe more. That's why we feel short of breath when we go to high altitude or when we exercise or when oxygen becomes reduced, for example, in drowning[.]" App.839:20-840:8. Dr. Bickler further explained that "there's the *physical part* of it, the drive to breathe, the increase in heart rate, the pounding of blood that you feel in your head, but *an additional effect is the emotional terror and panic that's elicited* to this primal reaction to having your oxygen supply cut off." App. 840:15-19 (emphasis added). Notably, the State's sole expert, Dr. Antognini, concurred with Dr. Bickler that inmates experience severe emotional suffering as the primal urge to breathe overcomes their knowledge that breathing will result in their death. App. 1134:20-1136:19. As the district court "assumed without deciding," under the Protocol, inmates endure that terror for at least two minutes, and possibly four and up to seven, not "the mere 'seconds' the State previously anticipated." App.2812 n.36. Nor is it the 30 to 40 seconds forecast by Dr. Antognini. In effect, the Protocol is akin to the State holding an inmate's head under water and drowning them. The nitrogen and mask equate to water and the restrained inmate is forced to consciously endure a prolonged period of suffering until the primal urge to breathe prevails and they ultimately

inhale nitrogen that belatedly renders them unconscious and ultimately kills them.

The initial physiological symptoms accelerate rapidly to full-blown "air hunger." Air hunger is "like you're breathing, but you still can't get enough air. Your breath feels ineffective. Your drive to breathe is going through the roof. You feel extremely short of breath, but yet you can't get enough oxygen." App.841:16-842:1. "It feels physically distressing to breathe that hard. It's like when you exercise to near exhaustion … you can feel your lungs aching." App.846:2-6. "Many patients [] have that same air hunger when they're having an asthma attack, or they're having a worsening of their emphysema or pneumonia, other types of lung disease. So it produces this tremendous hunger that is part of the body's response to … it's responding to the oxygen deprivation." App.842:1-9.

Appellees mischaracterize Dr. Bickler's expertise in human hypoxia, obtusely characterizing his expertise as limited to pulse oximeters. To the contrary, Dr. Bickler, a practicing anesthesiologist, has studied "the effects of hypoxia on humans for over 40 years [and] directed arguably the world's preeminent laboratory that studies hypoxia in humans [which has] literally hundreds of publications related to hypoxia,

everything from the cellular and molecular effects of hypoxia to humans at high altitude environments." App.831:1-16. His well-founded and uncontroverted opinions are based on his medical practice as an anesthesiologist, his knowledge of the medical effects of oxygen deprivation, his own published work, his personal experience undergoing profound hypoxia, his scientific background, and his collaborations with other scientists studying hypoxia. App.836:23-838:13.

Appellees incorrectly argue that Dr. Bickler's opinions should be discounted because his laboratory only tests subjects at a minimum saturation levels of 70%, ignoring that Dr. Bickler and his laboratory were involved in the foundational studies that determined 70% to be the floor at which human hypoxia research can be ethically conducted. App.834:16-835:18; App.846:7-847:3; App.876:20-877:3. Dr. Bickler's research through the Hypoxia Lab uses "protocols that we have developed and refined over almost 40 years of research on this topic … 70 percent is the level at which the symptoms of oxygen deprivation begin to be very profound and are problematic, therefore our studies are designed in a way that avoids more deep levels of hypoxia, greater degrees of oxygen deprivation." App.834:1-19.

At the outset of his career, Dr. Bickler both conducted studies where subjects' saturation levels were brought down to 50% or lower, and participated in such studies as a subject. "When we first started doing the work on pulse oximetry and we published work on it, this was in the 1980s. We did some studies where we brought the oxygen levels very low." App.861:7-23. "We no longer do those because they're so uncomfortable and even unnecessary to test pulse oximeters. App.861:1-6. Dr. Bickler explained that "the reason that we can do these studies on hypoxia is because we limit the degree of hypoxia that we study.... Our studies are specifically designed to be tolerable. And outside that zone of tolerance we don't go, because we know what hypoxia will do at those lower levels. And its just – *it's not humane* to go below 70 percent." App.846:7-847:3 (emphasis added).

Appellees acknowledge that Dr. Antognini, lacking any expertise in hypoxia, relied merely on a handful of discredited articles. Appellees are wrong that the *Hoffman* court is alone in disregarding the articles that are the foundation of Dr. Antognini's opinions. *See* App.1243; App.1211-1214. Dr. McAlary testified that he reviewed the articles cited by Dr. Antognini but "didn't rely upon them. There were several things that I

thought that were in error or incorrect conclusions based upon what was seen, so I wasn't going to rely on something that I didn't endorse." App. 791:25-793:3. Dr. Bickler likewise testified that it is "medically impossible to connect those dots" between the Ogden assisted suicide studies and nitrogen hypoxia execution. App.856:1-5. Similarly, "the only thing you can take from those reports [of industrial accidents involving anoxic environments] is that nitrogen can be lethal." App.856:2-858:2.

The district court ignored the uncontroverted expert testimony that the Protocol inflicts superadded physical. This was clear error.

## III. Appellees' Arguments Concerning Pre-Execution Fear and Anxiety Highlight the District Court's Error.

As noted in Boyd's opening brief,[1] the district court incorrectly determined that the amount of fear and anxiety an inmate experiences before the introduction of the fatal stimulus is part of the relevant time period to be considered when comparing execution methods. *See, e.g.,* App.2819. Appellees' Response, and flawed analysis, confirms the district court's error.

---

[1] *See* Appellant's Brief at 18-29.

According to Appellees, Boyd's argument was wrong because "the court's main point was that the delta between the inmate's *baseline* anxiety, which may well rise up to the moment of execution, and what each method adds is very small. Not severe." Response at 37 (emphasis in original). Appellees also erroneously assert that "a hypoxia execution does not begin at the moment the nitrogen is turned on, just as a firing squad execution does not begin at the moment the guns are shot. The larger context is not 'irrelevant.'" *Id.*[2]

These statements highlight the flaws in Appellees' and the district court's analysis. Again, as Boyd has asserted from the outset, it is the prolonged terror (and fighting the primal urge to breathe) an inmate is

---

[2] Notably, Appellees quote the district court in arguing that "[m]uch of the psychological and emotional pain caused by either nitrogen hypoxia or the firing squad is pain which the inmate would inevitably experience because he knows he will soon die—an experience which attends every execution and cannot be avoided." Response at 36. In turn, the district court was quoting *In re Ohio Execution Protocol Litig.*, 881 F.3d 447, 450 (6th Cir. 2018) for the proposition that "[p]sychological pain or mental suffering is a likely result of being sentenced to death and anticipating the execution." But in that case, the Sixth Circuit was quoting the trial court and explicitly noted that the trial court "was considering psychological pain *unaccompanied by* physical pain." *Id.* (emphasis in original). That plainly is not the case here; executions under the Protocol cause *both* physical and mental pain.

forced to suffer **after** nitrogen begins to flow into the mask during an execution and the inmate is subjected to conscious suffocation that is relevant. Any fear and anxiety experienced during the events leading up to the introduction of nitrogen are irrelevant. Here, the relevant time period to compare between the nitrogen Protocol and the firing squad are the time that nitrogen enters the mask until the time of unconscious and the time that a bullet first impacts the body until the inmate loses consciousness, respectively. It is exactly *that* time period – not the anxiety that may experience before then – that matters. Otherwise, the comparative exercise noted by the district court (App.2821-2822) would be meaningless and the fear and anxiety involved in any method, no matter how cruel and unusual, would always be roughly the same.

Further, Appellees' arguments confirm the *sui generis* approach they have taken with the Protocol. It is undisputed that Alabama was the first state to use nitrogen hypoxia for a judicial execution and that prior to Smith's execution on January 25, 2024, Alabama had never even tested the Protocol on any living being (App.805:3-806:2). The State has been adamant that executions are not medical procedures (*see Grayson v. Warden, Comm'r Alabama Doc*, 869 F.3d 1204, 1217 n.31 (11th Cir. 2017))

and that there is "science behind" the Protocol (Response at 1), but Appellees have done everything they can to avoid any type of scientific approach. It is a fundamental tenant of a scientific study that variables should be isolated and controlled so a causal effect can be established, usually through the use of a control group. *See, e.g.,* Moser P. *Out of Control? Managing Baseline Variability in Experimental Studies with Control Groups.* Handb Exp Pharmacol. 2020;257:101-117. Here, to measure the anxiety involved in the *actual execution* using nitrogen hypoxia, any scientific approach would absolutely seek to isolate the pre-fatal stimulus fear anxiety from the post-fatal stimulus fear anxiety to determine the anxiety, caused by the execution method itself, as opposed to the "larger context." Response at 37. The district court's consideration of this expanded, pre-execution time period was flawed and renders the comparative analysis simply wrong.

## IV.    Firing Squad Executions Result in Near Instantaneous Unconsciousness and Relatively Painless Death, Unlike the At Least Two Minutes of Pain and Severe Emotional Suffering Under the Protocol.

While attempting to support the district court's erroneous findings with regard to the efficacy of firing squad executions, Appellees mischaracterizes the record and Boyd's arguments in support of the firing

11

squad alternative when it contends that "there is no authority for the proposition that the Eighth Amendment demands six seconds of great physical pain, rather than (maybe) two minutes of emotional distress." Response at 35. Notably, Appellees fails to cite to the record in support of their argument. Because there is none. No one testified that an inmate executed by firing squad would suffer "six seconds of great physical pain."

To the contrary, the overwhelming unrebutted evidence before the district court compels a finding that any pain and suffering experienced during a firing squad execution is relatively minor (not three to six seconds) if not completely absent due to, among other things, the numbing effect caused to the nervous system by virtually-simultaneous impact of multiple bullets on the cardiovascular bundle and shock upon impact. *See* Appellant's Brief at 36-39 (evidence before district court showed: (1) inmate executed by a firing squad would suffer little if no pain in the 3-5 seconds before they became unconscious once shot (App.1250); (2) firing squad "causes death with minimal pain and suffering" (App.1252); (3) inmate being shot feels sensation like a severe blunt blow with no sharp or burning sensation (App.1253-1254); and (4)

a "firing squad is an efficacious means of execution for causing rapid and relatively painless death." App.931:18-20).

At best, Dr. Antognini while conceding that he had never witnessed a firing squad execution, believed that "it would be painful." App.1113:2-7. He makes no attempt to characterize or quantify the intensity of any such pain nor does he opine on its duration. In contrast, Dr. Williams testified about his own personal experience and professional career as a long tenured emergency room physician, as well as his expertise in firearms and ballistics, and opined that death by firing squad would result in a nearly painless and instantaneous death. *See* Appellant's Brief at 36-44. For the district court to find otherwise and rely upon an unsupported inference to conclude that an inmate would suffer pain for three to five seconds after being shot by firing squad, is clearly erroneous.[3]

In addition, Appellee's foregoing assertion that "rather than (maybe) two minutes of emotional distress" similarly mischaracterizes

---

[3] *See* App. 2821 ("Additionally, the firing squad carries with it a risk of three to five (possibly six) seconds of physical pain and suffering, and that type of physical pain is absent in an execution under the Protocol—which for some people may decrease the risk of psychological pain.").

the uncontroverted evidence before the district court below that establishes that inmates suffocated under the Protocol endure **both** physical pain and severe mental suffering – not just "emotional distress." *See* Appellant's Brief at 16-24 (evidence below established inmates executed under the Protocol suffered superadded conscious pain and mental suffering). In making that statement, Appellees ignore the evidence below regarding the prolonged physical pain inmates have suffered under the Protocol by attempting to equate the emotional suffering experienced by inmates under the Protocol with the overall mental anguish death row inmates suffer when condemned and the increasing emotional distress they experience as they confront their impending death. For purposes of deciding whether Boyd satisfied his burden of proposing a firing squad as a reasonable alternative to the Protocol consistent with Supreme Court precedent, the overwhelming evidence below regarding **both** the physical and mental pain endured by inmates executed under the Protocol post introduction of nitrogen must be considered in contrast to the three to five seconds of little or no pain suffered under fire squad executions. Appellees mistakenly conflates that pain and suffering with "two minutes of emotional distress."

The Supreme Court has consistently held that executions are cruel and unusual "when they involved torture or a ***lingering death***[.]" *Baze v. Rees*, 553 U.S. 35, 49 (2008) (citing *In re Kemmler*, 136 U.S. 436, 447 (1890)) (emphasis added). [4] "[A] penalty may be cruel and unusual because it is excessive and serves no valid legislative purpose." *Furman v. Georgia,* 408 U.S. 238, 331 (1972) (Marshall, J., concurring); *see also id.,* at 332 ("The entire thrust of the Eighth Amendment is, in short, against 'that which is excessive."). Boyd has conclusively shown that death under the Protocol, where the inmate is subjected to several minutes of an experience comparable to drowning, is both lingering and excessive in comparison to death by firing squad. Based on the overwhelming evidence presented at the evidentiary hearing for the district court to find that Boyd has not satisfied his burden of showing that death by firing squad is a feasible and readily implemented alternative method of execution that would significantly reduce a substantial risk of severe pain.

---

[4] The Supreme Court has stated that "torture [and] a lingering death" were the "evils of most immediate concern to the drafters of the [Eighth Amendment]." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976).

## V. The District Court's Concerns with Medical Aid in Dying are Erroneous.

MAID is a feasible and readily implemented alternative to the Protocol that would significantly reduce the risk of severe pain. Appellees' arguments about drug availability are speculative since they have not attempted to obtain these commonly available medications. The fact that MAID has not been used for executions previously is also irrelevant. Alabama was the first to use nitrogen hypoxia without any prior testing and despite the fact that nitrogen hypoxia was not legal in any other state at that point and had never been used in a judicial execution anywhere in the country.

Moreover, while MAID could potentially take longer to cause death than nitrogen hypoxia, the unrebutted evidence confirms that an inmate would be unconscious rapidly, and at all times prior to death, thereby avoiding the conscious suffocation – and superadded pain – caused by nitrogen hypoxia. Appellees' objection to the potential duration of MAID deaths ignores that the inmate would be unconscious and pain-free during this period, unlike the conscious suffering experienced during nitrogen hypoxia.

Further, contrary to Appellees' baseless assertions and the district court's clearly erroneous finding, MAID does not force an inmate to participate in their own execution. The undisputed evidence establishes that MAID can be administered via a nasogastric tube, which would eliminate any voluntary inmate participation. No medical staff would be needed for this process. As the undisputed evidence established, no one from ADOC's Health Services division or ADOC's outside contractor YesCare have any involvement in any executions and, instead, Execution Team members insert the IV lines for lethal injection executions. The same non-medical personnel who insert the IV lines for lethal injection executions could place a nasogastric tube for a MAID execution. Placing an IV in a vein and inserting an NG tube can both be done by non-medical personnel. Accordingly, this Court should reverse the district court's finding regarding MAID.

## VI. The Equities Favor Boyd.

Appellees essentially seek to penalize Boyd for not volunteering himself to be a test subject in a novel execution method and awaiting additional facts to be determined before bringing his challenge. Those additional facts and observations have ended up being key evidence in

this litigation and allow courts to make a more educated determination of the merits.

Appellees also make *no effort* to distance themselves from the unambiguous position they took in previous executions that such challenges were premature and speculative; this is precisely what Boyd expected and precisely what happened. *See* Appellant's Brief at 60. To penalize a litigant for making the best case for himself that he should not be executed by a method never utilized before in the history of the world as a method of execution is antithetical to the truth-seeking purposes of the litigation process. His timing – bringing a challenge **before his execution date was even set** – was not unreasonable, caused no prejudice the Appellees, and is easily distinguishable from Supreme Court precedent where a plaintiff had been "armed with *all* the facts they needed to bring their challenge." Appellant's Brief at 62. To argue otherwise denies the existence of the substantial reliance on such new facts by the parties, their experts, and the district court.

The consideration of equities is an act of balancing and weighing differing and competing interests. Appellees' reliance on victim interests inappropriately introduces retribution as a factor in Eighth Amendment

analysis, which should focus objectively on the method of execution rather than the nature of the underlying crime. Boyd's interest in not being executed in a cruel and unusual manner is Constitutionally engrained and must be afforded the utmost level of consideration where it embodies both a literal issue of life and death for Boyd as well as the legitimacy of the State's use of its ultimate power to execute its own people.

## CONCLUSION

For the foregoing reasons and those in Mr. Boyd's opening brief, this Court should reverse the district court's Memorandum of Opinion and Order (App.2771-2834) denying Boyd's Motion for Preliminary Injunction (App.58-236) and enjoin and stay his execution from proceeding on October 23, 2025 and until this action is concluded.

Respectfully submitted,

*/s/ Matthew C. Moschella*

Matthew C. Moschella
John C. La Liberte
SHERIN AND LODGEN LLP
One Lincoln Street, 14th Floor
Boston, Massachusetts 02111
(617) 646-2000
mcmoschella@sherin.com
jclaliberte@sherin.com
damichel@sherin.com

*Attorneys for Appellant*
*Anthony Boyd*

Dated: October 16, 2025

# CERTIFICATE OF COMPLIANCE

1.    This brief complies with the word limit of Fed. R. App.P. 32(a)(7)(B)(i) because, excluding the parts of the brief exempted by Fed. R. App.P. 32(f) and 11th Cir. R. 32-4, this brief contains 3,736 words.

2.    This brief complies with the typeface requirements of Fed. R. App.P. 32(a)(5) and the type-style requirements of Fed. R. App.P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 MSO in 14-point Century Schoolbook font.

Dated: October 16, 2025         By:

                     */s/ Matthew C. Moschella*
                     Matthew C. Moschella
                     SHERIN AND LODGEN LLP
                     One Lincoln Street, 14th Floor
                     Boston, Massachusetts 02111
                     (617) 646-2000
                     mcmoschella@sherin.com

                     *Attorney for Appellant*
                     *Anthony Boyd*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 16, 2025, a true copy of the foregoing brief has been filed electronically using the Court's CM/ECF system. All parties are represented by registered CM/ECF users and will be served by the appellate CM/ECF system.

Dated: October 16, 2025

By:

*/s/ Matthew C. Moschella*
Matthew C. Moschella
SHERIN AND LODGEN LLP
One Lincoln Street, 14th Floor
Boston, Massachusetts 02111
(617) 646-2000
mcmoschella@sherin.com

*Attorney for Appellant*
*Anthony Boyd*

4911-4826-3795